# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 04-1225

———————

Lisa Watson; Loretta Lawson,      \*
Individually and On Behalf of All     \*
Others Similarly Situated,     \*
    \*
    Plaintiffs - Appellants,     \*
    \* Appeal from the United States
v.     \* District Court for the
    \* Eastern District of Arkansas.
Philip Morris Companies, Inc., a     \*
Corporation; Philip Morris,     \*
Incorporated, a Corporation,     \*
    \*
    Defendants - Appellees.     \*

———————

Submitted: November 15, 2004
Filed: August 25, 2005

———————

Before RILEY,  JOHN R. GIBSON, and GRUENDER, Circuit Judges.

———————

JOHN R. GIBSON, Circuit Judge.

Lisa Watson and Loretta Lawson filed this interlocutory appeal, on their own behalf and as representatives of a class, from the district court's[1] denial of their motion to remand to state court.  Watson and Lawson filed their class action in

———————

[1]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas.

Arkansas state court, alleging that Philip Morris violated the Arkansas Deceptive Trade Practices Act. See Ark. Code Ann. § 4-88-107 *et seq*. We hold that the case was properly removed to federal court.

Watson and Lawson claim that Philip Morris engaged in "unfair business practices and/or deceptive and unlawful conduct in connection with the manufacture, distribution, promotion, marketing, and sale of Cambridge Lights and Marlboro Lights." They basically allege that Philip Morris designed its cigarettes to deliver more tar and nicotine to smokers than its use of the labels "lights" and "lowered tar and nicotine" in its advertising would suggest. The propriety of remand is the only issue before us, as it was in the district court, and we express no views on the merits.

Philip Morris removed the action pursuant to 28 U.S.C. § 1442(a)(1) (2000), which permits removal where a person is sued for actions taken under the direction of a federal officer. Philip Morris claims it satisfies the requirements of the federal officer statute because it was acting under the direct control of the Federal Trade Commission (FTC) when it engaged in the allegedly unlawful conduct. The district court denied Watson's and Lawson's motion to remand and certified the following question for interlocutory appeal under 28 U.S.C. § 1292(b): "May Philip Morris remove this lawsuit to federal court under 28 U.S.C. § 1442(a)?" Slip op. at 36. We affirm the district court's answer of "yes" to that question.

The applicability of this removal statute depends in large part on the role the FTC plays in regulating the tobacco industry.[2]

---

[2]See Federal Trade Comm'n v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 37-38 (D.C. Cir. 1985), for a comprehensive history of the FTC's involvement in regulating unfair and deceptive advertising in the tobacco industry.

The Federal Trade Commission Act authorizes the FTC to regulate "unfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(2) (2000), which includes regulation of unfair and deceptive tobacco advertisements, Cipollone v. Liggett Group, Inc., 505 U.S. 504, 513 (1992) (FTC has "long regulated unfair and deceptive advertising practices in the cigarette industry").

In the 1950s, the FTC's policy changed from permitting some claims of "low" or "lower" tar and nicotine levels to prohibiting all such representations in advertising. The FTC wanted a uniform rating system so that consumers could compare tar and nicotine levels among brands. The FTC developed the Cambridge Filter Method, which uses a smoking machine that takes a two-second puff on a cigarette every sixty seconds until the cigarette is smoked to a specified length. Brown & Williamson, 778 F.2d at 37. The machine collects tar and nicotine on filter pads to be measured. Since its first formal testing in 1967, the FTC has been reporting the Cambridge Filter Method results in the Federal Register. From its initial development, the FTC was aware that the testing method did not measure the amount of tar or nicotine that an individual smoker may receive. The purpose of the test was not to replicate human smoking but to provide a basis for comparison.

When the FTC proposed a trade regulation rule in 1970 that would require advertisements to disclose tar and nicotine ratings, as determined by the Cambridge Filter Method, several leading tobacco companies responded by entering into an agreement to disclose the Cambridge Filter Method results in all cigarette advertising. The FTC accepted the agreement, which was conditioned on suspension of the formal rulemaking proceedings. Letter from Eight Tobacco Companies to FTC (Dec. 17, 1970) ("Letter Agreement").

After twenty years of testing, the FTC decided to terminate its cigarette testing lab, and instead require the cigarette industry to self-test, using the Cambridge Filter

Method, and to submit results that would continue to be published in the Federal Register. The FTC retained the right to conduct unannounced inspections of the industry testing facilities and the right to confirm the test results through a government lab.

Based upon the FTC's involvement in the tobacco industry, the district court denied Watson's and Lawson's motion to remand to state court. Our review of that denial is de novo. See Nichols v. Harbor Venture, Inc., 284 F.3d 857, 860 (8th Cir. 2002).

Section 1442(a)(1) permits removal by the following:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

(emphasis added). Section 1442(a) requires that a defendant: (1) act under the direction of a federal officer; (2) show a nexus or "causal connection" between the alleged conduct and the official authority; (3) have a colorable federal defense; and (4) be a "person" within the meaning of the statute. See, e.g., Jefferson County v. Acker, 527 U.S. 423, 431 (1999) (requiring a "colorable federal defense" to a suit for "a[n] act under color of office" and "a 'causal connection' between the charged conduct and asserted official authority"); Mesa v. California, 489 U.S. 121, 125 (1989) (recognizing the 1442(a) requirement of "'person[s] acting under' an officer of the United States or any agency thereof" sued "for act[s] under color of such office"); United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001) (requiring "a 'colorable defense arising out of [the defendant's] duty to enforce federal law'"); Paldrmic v. Altria Corp. Servs., Inc., 327 F. Supp. 2d 959, 964 (E.D.Wis. 2004)

(incorporating all four requirements). Watson and Lawson dispute only the first and second requirements.

In Willingham v. Morgan, 395 U.S. 402, 406-07 (1969), the Supreme Court explained why the federal officer removal statute was not meant to be given a "narrow" or "limited" interpretation:

> One of the primary purposes of the removal statute–as its history clearly demonstrates–was to have such defenses litigated in the federal courts. . . . In cases like this one, Congress has decided that federal offices, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).

The primary purpose of giving the protection of a federal forum under this statute has a lengthy history. The broad scope of federal officer removal is explained in the early case of Tennessee v. Davis, 100 U.S. 257, 263 (1880), where the Court applied the original version of the statute to revenue officers:

> [I]f their protection must be left to the action of the State court,–the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a State may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The State court may administer not only the laws of the State, but equally Federal law, in such a manner as to paralyze the operations of the government. And even if, after trial and final judgment in the State court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, and the exercise of acknowledged Federal power arrested.

See also Arizona v. Manypenny, 451 U.S. 232, 243 (1981) ("Respondent here, by obtaining a federal forum, has fully vindicated the federal policies supporting removal. The plainest evidence of this vindication is the District Court's application of the immunity defense."); Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 397-98 (5th Cir. 1998). The Supreme Court interpreted the original version of the statute to exclude agencies' removal ability under the statute. Primate Protection League v. Admin'rs. of Tulane Educ. Fund, 500 U.S. 72, 87 (1991). Congress responded by amending the statute to explicitly permit agency removal. See Pub. L. 104-317, § 206(a)(1) (1996). Congress's decision to amend the statute to reverse Primate and permit agency removal provides further support for a broad interpretation of the federal officer removal statute.

I.

Whether a defendant is "acting under" the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendant.

"[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts . . . were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." Virden v. Altria Group, Inc., 304 F. Supp. 2d 832, 844 (N.D. W.Va. 2004) (quoting Ryan v. Dow Chem. Co., 781 F. Supp. 2d 934, 947 (E.D.N.Y. 1992)). Mere participation in a regulated industry is insufficient to support removal unless the challenged conduct is "closely linked to detailed and specific regulations." Virden, 304 F. Supp. 2d at 844 (quoting In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 216 F. Supp. 2d 474, 500 (D. Md. 2002), rev'd sub nom. on other grounds, Pinney v. Nokia, Inc., 402 F.3d 430 (4th Cir. 2005)). In contrast to the district court's decision in this case, every other district court confronted with tobacco companies alleging they were acting under a federal officer has remanded the case to state court. See Virden, 304 F. Supp.

2d 832; Paldrmic v. Altria Corp. Servs., 327 F. Supp. 2d 959 (E.D. Wis. 2004); Tremblay v. Philip Morris, 231 F. Supp. 2d 411 (D.N.H. 2002).

Although tobacco companies' efforts at federal officer removal have not been successful in other courts, companies contracting with the government have had more success. Courts have found private actors, working under government contracts, to be acting under the direction of a federal officer where the government maintained control over the manner in which the contractor performed the contracted work or monitored the performance of the work. Virden, 304 F. Supp. 2d at 845-46.

In a Fifth Circuit government contract case, Diamond Shamrock Chemical Company manufactured herbicide, now known as Agent Orange, for the government. Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 390 (5th Cir. 1998). A nurse in Vietnam claimed that exposure to Agent Orange caused her to develop lymphoma. Id. Diamond removed the case to federal court and argued that when it manufactured Agent Orange it was acting under the direction of a federal officer. Id. at 398. The government specified the formula for Agent Orange, as well as the packaging, labeling and shipping requirements. Id. at 399. The government also inspected the labeling of the containers, id., and compelled Diamond to deliver the Agent Orange to it under threat of criminal sanctions, id. at 398. In finding Diamond acted under the direction of a federal officer, the court stated:

> We are convinced that the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange, the compulsion to provide the product to the government's specifications, and the on-going supervision the government exercised over the formulation, packaging, and delivery of Agent Orange is all quite sufficient to demonstrate that the defendants acted pursuant to federal direction and that a direct causal nexus exists between the defendant's actions taken under color of federal office and Winters's claims.

Id. at 399-400.

The extent of federal direction reached a similar level in Fung v. Abex Corp., 816 F. Supp. 569 (N.D. Cal. 1992). Fung involved exposure to asbestos during Abex's construction of submarines pursuant to federal contract. Id. at 570-71. The district court found that the government monitored Abex's performance "at all times" and required it to "construct and repair the vessels" according to the contract specifications. Id. at 572-73. In addition, the government retained the right to inspect, test, and approve all contract supplies, and performed its own tests on the submarines to ensure compliance with the contract. Id. at 573. The district court found that this level of control and direction satisfied the "acting under" requirement of section 1442(a). Id.

Here, the FTC exercises the same type of comprehensive, detailed regulation and does the same kind of ongoing monitoring as in Winters and Fung. In addition to specifying a testing method that was discussed in detail in two separate submissions to chemists' journals, the FTC modified the testing method to include the following requirements:

> 1. Smoke cigarettes to a 23 mm. butt length, or to the length of the filter and overwrap plus 3 mm. if in excess of 23 mm.,
> 2. Base results on a test of 100 cigarettes per brand, or type,
> 3. Cigarettes to be tested will be selected on a random basis, as opposed to "weight selection,"
> 4. Determine particulate matter on a "dry" basis . . . to determine the moisture content,
> 5. Determine and report the "tar" content after subtracting moisture and alkaloids [(]as nicotine) from particulate matter,
> 6. Report tar content to the nearest whole milligram and nicotine content to the nearest 1/10 milligram.

*Federal Trade Commission: Testing for Tar and Nicotine Content*, 32 Fed. Reg. 11,178 (Aug. 1, 1967). The FTC's specificity in testing procedures is comparable to the specificity of the government's formula for Agent Orange.

Another example of the detail involved in the government's directives to the tobacco industry is the specific manner in which the industry agreed to disclose the tar and nicotine ratings in advertising:

> The disclosure will be in the following language:
> ____mg. "tar", ___mg. nicotine
> av. per cigarette, FTC report (date)

Letter Agreement at 2. In Fung, the parties' agreement included the design for submarines, and in this case the parties' agreement included the design for testing cigarettes and disclosure of ratings. In Winters, the government controlled the delivery and labeling of Agent Orange. Here, the FTC controls the delivery of tar and nicotine information to consumers. The FTC's ongoing monitoring of the cigarette industry far exceeds the monitoring in Winters. The government in Winters monitored one small aspect of the Agent Orange creation and distribution process-- the labeling of the containers. Here, the FTC itself conducted the entire testing process for twenty years and now requires the cigarette manufacturers to conduct the testing to its specifications. The FTC continues to inspect the industry labs, independently verify the results, and publish the ratings. In addition, part of the FTC's ongoing monitoring includes monitoring cigarette ads and occasionally bringing claims against companies for deceptive advertising.

We are satisfied that the level of specificity of the direction is more extensive than that in Winters, but the question remains whether the government compels compliance with its directions. In Winters, Diamond Shamrock was compelled to supply the Agent Orange to the government. In Fung, the defendant acted pursuant to a binding contract that gave the government legal rights to enforce its directions. In this case, Philip Morris acted pursuant to a voluntary industry agreement. Two of the courts confronted with federal officer removal and the tobacco industry have found it significant that the agreement to test and disclose ratings was a "voluntary"

agreement, not a formal rule.  See, e.g., Paldrmic, 327 F. Supp. 2d at 966; Virden, 304 F. Supp. 2d at 841-42.

We are convinced that the record in this case shows a level of compulsion that establishes that Philip Morris was indeed "acting under" the direction of a federal officer.  The FTC effectively used its coercive power to cause the tobacco companies to enter the agreement.  The FTC made the policy decision to pursue a voluntary agreement instead of proceeding by formal rulemaking.  The tobacco industry first proposed an agreement on October 23, 1970, which was just over two months after the FTC announced an intention to make a formal rule requiring disclosure of the Cambridge Filter Method tar and nicotine ratings.  This "voluntary agreement" was a substitute for a formal rule.  The industry almost certainly would not have proposed the agreement if the FTC had not threatened to make a formal rule.  Though the FTC did not act formally, the effect of its actions still compelled the tobacco companies to adhere to a testing and advertising standard that was prompted by the FTC.  The FTC agreed with the industry that a voluntary agreement was preferable to the formalities of rulemaking.

FTC Chairperson Miles W. Kirkpatrick explained how an agreement would best serve the goals of the FTC:

> The Commission's objective is to insure that all cigarette advertising make these tar and nicotine disclosures as soon as possible.  If the industry can devise a voluntary plan that is feasible and appropriate, the Commission is willing to consider it.  A trade regulation rule, if contested in the courts, might take a long time to become effective; a workable, voluntary plan by the industry could be put into effect immediately.

Press Release, FTC (Oct. 1, 1970).

Daniel Oliver, Chairman of the FTC in 1987, explained that the FTC's practice in advertising regulation was moving more toward agreements and away from rulemaking, which had proved to be inefficient, "little used and not terribly successful." Bringing a single case against one cigarette company would have the effect of bringing the whole industry into compliance and would do so much more quickly than would a formal rulemaking process. As a result, voluntary agreements have become part of a general trend in administrative law, and the tobacco industry has responded to that trend with cooperation.

Even if the companies had not been compelled to enter the agreement originally, after the companies entered the agreement, the FTC has enforced compliance with the agreement. The FTC's comments suggest it would bring an action for deceptive advertising or reinstitute formal rulemaking proceedings if a company did not disclose the tar and nicotine ratings. Though one could call the agreement voluntary, the reality is that the cigarette companies have included the Cambridge Filter Method results in their cigarette advertising for over thirty years. The main difference between a formal rule and an agreement is that the FTC enforces the disclosure of the Cambridge Filter Method's results by bringing an action against the company for deceptive advertising rather than directly enforcing a regulation.[3] Regardless of the enforcement method, the FTC has compelled the tobacco industry to advertise the tar and nicotine ratings as determined by the Cambridge Filter Method.

The FTC has made it clear it has not found any other testing method adequate and will consider advertising to be "deceptive" if it deviates from the Cambridge

---

[3]"[W]e cannot force a company to use nor can we approve in advance the kind of testing a company uses. We can make sure that the testing a company uses is an accurate test, especially as that accuracy relates to the FTC method." MacLeod testimony. See FTC v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 44-45 (D.C. Cir. 1985).

Filter Method. In an advisory opinion rejecting one company's offer to advertise a tar level higher than the most recent Cambridge Filter method results, the FTC explained that consumers could be confused if a company were to advertise tar levels that differed from the published Cambridge Filter Method results. In re Lorillard, 92 F.T.C. 1035 (1978). That statement, along with others,[4] sent a clear signal to the tobacco companies that they would risk a deceptive advertising claim if they failed to advertise tar and nicotine levels in accordance with the Cambridge Filter Method.

In comparison, the government contract in Fung was not compelled and could be considered a "voluntary agreement" and yet was certainly enforceable once entered. Similarly, in the Agent Orange case, Diamond Shamrock *chose* to participate in the herbicide industry and was already manufacturing herbicide with some of the components of Agent Orange before it was compelled to turn over its Agent Orange to the government. See Winters, 149 F.3d at 399. Even a volunteer can be "acting under" a federal officer. In Oregon v. Cameron, 290 F. Supp. 36, 37 (D. Or. 1968), an unpaid supervisor of a volunteer program and other participants were acting under a federal officer when they entered a farm to help a migrant worker obtain health care. Removal was appropriate because the volunteers were assigned pursuant to federal statute "to work in meeting the health . . . needs of . . . migratory workers and their families." Id. at 38. They chose to participate in the program and acted in accordance with the duties they had been assigned, just as Philip Morris has chosen to participate in the cigarette industry and has agreed to follow the FTC's policies.

---

[4]The FTC additionally stated that "the public interest requires that all test results presented to the public be based on a uniform method used by all laboratories" because "[u]se of more than one testing method . . . would only serve to confuse or mislead the public." News Release, FTC (Aug. 1, 1967). It added that "statements or representations based on non-standardized tests having no official or governmental sanction would tend to confuse and mislead the public." Letter from FTC secretary Joseph W. Shea to Howard Bell (Oct. 25, 1967).

We have been instructed by the Supreme Court to interpret this removal statute broadly, to give effect to its purpose. See Colorado v. Symes, 286 U.S. 510, 517 (1932); Willingham v. Morgan, 395 U.S. 402, 406-07 (1969); see also Winters, 149 F.3d at 398. In essence, the requirement that the companies enter the agreement was a rule in substance though not in form. If we give the statute a broad and liberal interpretation as we are required to do, the fact that the FTC approved an agreement instead of proposing a rule should not defeat removal under section 1442(a).

The FTC involved itself in the tobacco industry to an unprecedented extent. Throughout the record, there were several indications that both developing a testing method and carrying out the testing evidenced an unusually high level of governmental participation and control. Deputy Director of the Bureau of Consumer Protection of the FTC, C. Lee Peeler, could not recall any other instance where the FTC had gone so far as to specify the testing methodology. To actually conduct the testing itself for over twenty years, instead of delegating that task to the industry, was outside the government's normal course of conduct. The operation of a cigarette lab by the FTC was "really something that was unique" and "unusual for . . . the Commission."

The record is filled with FTC announcements of its policy as well as communications between the FTC and the cigarette industry, which show comprehensive and detailed control. The record establishes that Philip Morris acted under the direction of a federal officer.

## II.

For federal officer removal there must be a "causal connection" that links the federal officer's direction and control to the acts challenged in the plaintiff's complaint. It must be shown that "the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to

-13-

comprehensive and detailed regulations." <u>Virden v. Altria Group</u>, 304 F. Supp. 2d 832, 844 (N.D. W. Va. 2004) (quoting <u>Ryan v. Dow Chem. Co.</u>, 781 F. Supp. 2d 934, 947 (E.D.N.Y. 1992)). Here, the acts regulated by the FTC form the basis for Watson's and Lawson's class action.

The complaint in <u>Tremblay v. Philip Morris</u>, 231 F. Supp. 2d 411, 418-19 (D.N.H. 2002) was drawn more narrowly than Watson's and Lawson's complaint. The court in <u>Tremblay</u> held that Philip Morris's actions were not conducted under the direction of a federal officer or agency because the complaint did not challenge the "enforcement or wisdom of any FTC policy, procedure or regulation." <u>Id.</u> at 419. Instead, the complaint alleged that Philip Morris manipulated the FTC's policies and exploited the Cambridge Filter Method. <u>Id.</u> at 419.

The allegations of the complaint in <u>Paldrmic</u> also focused narrowly on the manufacture and design of the cigarettes. "Although the Cambridge System is deeply intertwined with plaintiff's allegations, the gravamen of his lawsuit is that defendant, fully aware that it had agreed to communicate tar and nicotine test results within certain parameters, designed and manufactured its product so as to use the test to mask the truth about its product." 327 F. Supp. 2d at 967. The conduct challenged in the complaint was the design or manufacture of cigarettes, and the FTC did not direct Philip Morris how to design and manufacture its product. <u>Id.</u>

In this case, Watson and Lawson challenge more than just the cigarette design. They also challenge Philip Morris's "marketing and promoting" of low tar and nicotine cigarettes, its "representations," and its alleged deception of consumers. Thus, in part, their complaint challenges Philip Morris's advertising. It cannot seriously be argued that the FTC does not direct and control the advertising of cigarettes. This Court must look at the FTC's regulation of cigarette advertising because the conduct Watson and Lawson challenge includes cigarette advertising.

-14-

Here, Watson and Lawson claim that Philip Morris's use of low tar descriptors such as "lights" or "lowered tar" are deceptive or misleading because the actual tar and nicotine delivered to the smoker is much higher than the FTC results communicate to smokers. The FTC defines "low tar" as 15.0 mg. or less tar.[5] *FTC Report to Congress, Pursuant to the Federal Cigarette Labeling and Advertising Act* (1979).

In 1971, the FTC and American Brands, Inc. entered into a consent order based upon a complaint the FTC issued. There, the FTC explained its view of how the use of certain descriptors could constitute deceptive advertising--it would be deceptive to use descriptors like "low," "lower," "reduced," or other qualifying terms unless the tar and nicotine levels were also stated. The tar and nicotine levels were to be measured by "the testing method employed by the Federal Trade Commission," which is the Cambridge Filter Method. Watson and Lawson claim it is deceptive for Philip Morris to use a low tar descriptor in conjunction with its cigarettes' FTC rating. The very combination Watson and Lawson challenge as deceptive is the same combination the FTC requires to *not* be deceptive. Whether Philip Morris's labeling of cigarettes as "lights" is deceptive directly implicates the enforcement and wisdom of the FTC's tobacco policies.

It is not as if Watson and Lawson discovered new designs by Philip Morris that the FTC did not contemplate when it required the disclosure of test results. The FTC was well-aware of the limitations of the Cambridge Filter Method. In 1977, the FTC solicited public comment on a problem similar, if not identical to, some of Watson's and Lawson's claims in this case. The FTC studied how the placement of ventilation holes in cigarettes affected their tar and nicotine ratings. If vent holes were covered by the smoking machine's cigarette holder, but open when smoked by a person, then

---

[5]The FTC recognized that cigarette manufacturers have also used the term "ultra low tar" for cigarettes containing 1.0 - 5.0 mg. tar, but the FTC has not formally defined that term.

less tar and nicotine would pass through the cigarette to the smoker than the ratings reflected. Conversely, if the smoker covered vents that the machine's cigarette holder left open, more tar and nicotine would pass through the cigarette to the smoker than the ratings reflected.

The FTC was fully aware that the placement of ventilation holes near the tip of the cigarette complicated the comparability of the tar and nicotine ratings among different brands. The same problem reemerged in the early 1980's when Brown and Williamson developed the Barclay brand, which had ventilation channels instead of ventilation holes. Although the FTC recognized these problems and solicited comment on them, the FTC ultimately chose to continue using the Cambridge Filter Method.

Watson and Lawson challenge the FTC's policy judgment that despite the failure of the Cambridge Filter Method to take into account ventilation holes or channels, the test results should still be included in advertising, even if alongside "light" descriptors, to prevent deception. In contrast, Watson and Lawson claim that this grouping of test results and descriptors renders advertising deceptive. Their claims are sufficiently related to the FTC's direct and comprehensive control to establish a causal connection.

## III.

The final two requirements for removal under 28 U.S.C. § 1442(a) are that Philip Morris must present a "colorable federal defense" and that it must be a "person" within the meaning of the statute. To satisfy the requirement of a colorable federal defense, Philip Morris pleaded that Watson's and Lawson's state law claims were preempted by Section Five of the Federal Cigarette Labeling and Advertising Act. Philip Morris's Notice of Removal cites Geier v. American Honda Motor Co., 529 U.S. 861 (2000) in support of its preemption defense. The district court order

stated that Watson and Lawson "do not dispute that the federal preemption defense raised by the Defendants is a 'colorable' claim to a federal defense." Slip op. at 14. The court cited United States v. Todd, 245 F.3d 691, 693 (8th Cir. 2001), that for a defense to be colorable it need only be plausible and further stated that it did not believe the district court opinion in United States v. Philip Morris, Inc., 263 F. Supp. 2d 72 (D.D.C. 2003), prevents the preemption defense from being "colorable." Slip op. at 14 & fn. 5. The district court emphasized that its decision "reaches no conclusion on the merits of Philip Morris' preemption defense but is ruling that the FTC's regulation of Philip Morris' cigarette testing and advertising rises to a level sufficient to invoke federal jurisdiction under the federal removal statute." Slip op. at 24.

In their brief before this Court Watson and Lawson state, "For the purposes of the Remand Motion only, Plaintiffs do not contest . . . whether the federal preemption defense it had raised sufficed as a 'colorable' federal defense." Watson and Lawson argue only that Philip Morris failed at a minimum to demonstrate that it acted under the direction of a federal officer, or to show a causal nexus between plaintiffs' claims and the acts of Philip Morris, allegedly performed under the color of a federal office.

Although we are required to review the requirement of a colorable federal defense for jurisdictional purposes, the threshold is quite low. We do not require the defendant to "win his case before he can have it removed." Willingham v. Morgan, 395 U.S. 402, 407 (1969). The defendant need only raise a "colorable" federal defense. Id.; Jefferson County v. Acker, 527 U.S. 423, 431 (1999). We have no hesitation in concluding that Philip Morris, in its Notice of Removal, has set forth a colorable federal defense which Watson and Lawson have not contested.

The fourth requirement for federal officer removal is that the party must be a "person" within the meaning of the statute. Several courts have concluded that a corporation can be a "person" within the requirements of federal officer removal. See

-17-

Ryan v. Dow Chem. Co., 781 F. Supp. 934, 946-47 (E.D.N.Y. 1992); Fung v. Abex Corp., 816 F. Supp. 569, 572 (N.D. Cal. 1992). We find the analysis in Ryan to be persuasive.

We affirm the district court's order denying remand and finding removal proper under section 1442(a).

GRUENDER, Circuit Judge, concurring.

I fully concur in the court's opinion and judgment. I write separately to emphasize that our decision today should not be construed as an invitation to every participant in a heavily regulated industry to claim that it, like Philip Morris, acts at the direction of a federal officer merely because it tests or markets its products in accord with federal regulations. I believe that in most instances, a contract, principal-agent relationship, or near-employee relationship with the government will be necessary to show the degree of direction by a federal officer necessary to invoke removal under 28 U.S.C. § 1442(a)(1). See Virden, 304 F. Supp. 2d at 845-46 (collecting cases embodying the "regulation plus" concept, where limited discretion under a government contract, action as an agent for the federal government, or action in the nature of a government employee, in addition to government regulation, supported a defendant's invocation of the federal officer removal statute).

In this case, as the court's opinion makes clear, the FTC's direction and control of the testing and marketing practices at issue is extraordinary. The FTC developed the Cambridge Filter Method, conducted the testing itself for twenty years before farming it out to the cigarette companies, threatened a deceptive advertising action if the method of testing deviated in the smallest way from the government-mandated method and controlled the disclosure of the results throughout. Because the FTC passed the function of performing the testing to the cigarette companies while allowing them no independent control of the process whatsoever, this is a rare case

in which federal officer jurisdiction is appropriate even in the absence of a contract, principal-agent relationship, or near-employee relationship with the government.

With these observations, I join the court's opinion and judgment.

_____