Harrison **MULFORD III**, Rhonda Newby, Cory Fox, and Richard DeLuna, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**ALTRIA GROUP, INC., and Philip Morris, USA, Inc., Defendants.**

No. CIV.05 659 MV/RHS.

United States District Court,
D. New Mexico.

March 16, 2007.

Gerard V. Mantese, Mark Rossman, William S. Ferguson, for Plaintiffs.

Andrew G. Schultz, Gregory P. Stone, Martin D. Bern, for Defendant Philip Morris USA Inc.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

On May 5, 2006, Defendant Philip Morris USA, Inc. ("Philip Morris") filed a Motion for Summary Judgment Based on Federal Preemption under FCLAA's Express Preemption Provision, 15 U.S.C. § 1334(b), (Doc. No. 53) (hereinafter "Express Preemption Motion") and a Motion for Summary Judgment based on N.M. Stat. Ann. § 57–12–7 and Implied Federal Preemption (Doc. No. 53) (hereinafter "Implied Preemption Motion"). The Court, having reviewed the briefs and arguments of the parties, the relevant law, and otherwise being fully advised, finds that Defendant's Express Preemption Motion should be granted as to Plaintiffs' claim based on a theory of fraudulent concealment, failure to warn, and warning neutralization and denied as to Plaintiffs' claim based on a theory of fraudulent misrepresentation and that Defendant's Implied Preemption Motion should be denied.

## I. INTRODUCTION

Plaintiffs are smokers who purchased Marlboro Lights and Cambridge Lights brands of cigarettes in New Mexico. Plaintiffs have brought a class action suit against Defendants Philip Morris and Altria Group, Inc., who they allege manufactured "lowered tar" or "Lights" filtered cigarettes under the brand names "Cambridge Lights" and "Marlboro Lights." Plaintiffs allege that Defendants violated the New Mexico Unfair Trade Practices Act ("UPA"), NMSA § 57–12–1 *et seq.*, by deceptively marketing the cigarettes as "Light" and as being "Lowered in Tar and Nicotine." Plaintiffs also allege that De-

fendants deceptively designed the "Light" cigarettes to register lower levels of tar and nicotine when tested by the Federal Trade Commission ("FTC") testing method than would actually be delivered to consumers of the product. Plaintiffs assert that Defendants fraudulently concealed the fact that the cigarettes are not light or lower in tar and nicotine than regular cigarettes, that people do not smoke like the testing machine, and that smokers compensate when smoking "Light" cigarettes in a way that causes them to get more tar and nicotine than predicted by the machine. Plaintiffs contend that they were economically damaged by Defendants' deceptive practices when they purchased Cambridge Lights and/or Marlboro Lights cigarettes and did not receive "light" or "lowered tar and nicotine" cigarettes.

Defendant Philip Morris argues that Plaintiffs' claim under the UPA must be dismissed because it is expressly preempted by the preemption clause of the Federal Cigarette Labeling and Advertising Act ("FCLAA"), 15 U.S.C. §§ 1331 *et seq.* Philip Morris, in a separate motion, also argues that Plaintiffs' UPA claim must be dismissed because it is preempted under principles of implied conflict preemption and because Philip Morris' actions were exempt from liability under the UPA, as they were "expressly permitted" by the FTC.

## II. BACKGROUND

The following facts are either undisputed or are construed in the light most favorable to Plaintiffs.

### A. History of FTC and Congressional Action in the Cigarette Industry[1]

The Federal Trade Commission Act ("FTC Act") empowers the FTC to regu-

---

1. Much of the history of congressional and FTC regulation in cigarette advertising is con-

tained in the affidavit of James C. Miller, III,

late "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). This authority includes the regulation of unfair and deceptive tobacco and cigarette advertisements. *Watson v. Philip Morris Companies, Inc.,* 420 F.3d 852, 855 (8th Cir.2005).

In the 1950s, the scientific community began to publish the results of studies demonstrating a link between cigarette smoking and lung cancer. Miller Aff. ¶ 70 & Def.'s Ex. 68. The cigarette industry responded by creating and marketing filtered cigarettes and "lower tar and nicotine" cigarettes. Miller Aff. ¶ 70. In September 1955, the FTC adopted the Cigarette Advertising Guides, which allowed cigarette manufacturers to make claims regarding tar and nicotine levels, but only if they could substantiate their claims "by competent scientific proof." Miller Aff. ¶ 73 & Def.'s Ex. 68 at 299 & Ex. 70; *Price v. Philip Morris, Inc.,* 219 Ill.2d 182, 302 Ill.Dec. 1, 848 N.E.2d 1, 7 (2005). By 1957, the FTC obtained voluntary discontinuance of 75 advertising claims it found objectionable without having to institute formal proceedings. Miller Aff. ¶ 74 & Def.'s Ex. 68 at 278.

Nevertheless, because of the absence of uniform testing, the FTC found the tar and nicotine claims in advertisements misleading and confusing. *See* Miller Aff. ¶ 76 & Def.'s Ex. 74 at 1. In 1959, the FTC issued an industry-wide advisory stating that "all representations of low or reduced tar or nicotine, whether by filtration or otherwise, will be construed as health claims." Def.'s Ex. 75; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 7. The stated purpose for the change was "to eliminate from cigarette advertising representations which in any way imply health benefit." Def.'s Ex. 75; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 7. The advisory also noted that any nonconforming advertisements would be forwarded to other Bureaus looking forward to mandatory procedures. Def.'s Ex. 75. After issuance of the advisory, seven major cigarette manufacturers agreed to delete all tar and nicotine claims from their advisements. Miller Aff. ¶ 78 & Def.'s Ex. 80 at 82. Thus, the advisory, in effect, banned advertising regarding tar and nicotine levels. *See id.;* Def.'s Ex. 79 at 1; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 7.

On December 11, 1959, the FTC filed a complaint against Brown & Williamson Tobacco Corporation, which alleged that the company's advertisements violated the FTC Act by representing that the cigarette's filter absorbs more tar and nicotine than filters used in other cigarettes. Miller Aff. ¶ 79 & Def.'s Ex. 81 at 1. In February 1960, Brown & Williamson Tobacco Corporation entered into a consent order to cease and desist making such representations. *Id.*

and the hundreds of exhibits accompanying his affidavit. Plaintiffs contend that his "purported expert testimony is improper and inadmissible" and "did not require any specialized expertise, training, or knowledge." Pls.' Expanded Combined Resp. (Doc. No. 62) at 4 & n. 2. Although much of the affidavit is a summary of historical facts, Mr. Miller also adds context to the facts and interjects opinion about the meaning and significance of various FTC actions. The Court finds that Mr. Miller's affidavit is relevant, reliable, and helpful in explaining the FTC's extensive role in the regulation of cigarette advertising. Mr. Miller's affidavit shows his specialized knowledge of the area through his considerable education and experience. For these reasons, the Court will admit and consider the affidavit under Fed.R.Evid. 702, giving it the appropriate weight it deserves. *Cf. Flanagan v. Altria Group, Inc.,* 423 F.Supp.2d 697, 700 (E.D.Mich.2005) (denying motion to strike similar affidavit of expert regarding FTC involvement in cigarette advertising). The Court notes that it has examined the exhibits attached to the affidavit, which for the most part are publicly available documents, in order to evaluate the opinions and confirm whether the factual underpinnings are sound.

On January 11, 1964, the Surgeon General's Advisory Committee on Smoking and Health released a report that concluded: "Cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action." Miller Aff. ¶ 83 & Def.'s Ex. 86 at 33. In response to this report, the FTC promulgated a new trade regulation rule, establishing that it would be a violation of the FTC Act to "fail to disclose, clearly and prominently, in all advertising and on every pack, box, carton or other container [of cigarettes] that cigarette smoking is dangerous to health and may cause death from cancer and other diseases." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 513–14, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citing 29 Fed.Reg. 8325 (1964)). The rule was to take effect on January 1, 1965. *Id.* Upon a congressional request, however, the FTC postponed enforcement of the regulation for six months. *Cipollone*, 505 U.S. at 513–14, 112 S.Ct. 2608. After Congress enacted the FCLAA, the FTC then vacated its regulation. Miller Aff. ¶ 89 & Def.'s Ex. 93; *see also Price*, 302 Ill.Dec. 1, 848 N.E.2d at 7–8.

In July 1965, Congress enacted the FCLAA, which mandated the following warning on cigarette packages: "Caution: Cigarette Smoking May Be Hazardous to Your Health." Pub.L. 89–92, § 4, 79 Stat. 283. The FCLAA provided that no other statement related to smoking and health could be required on cigarette packages, and that no warning at all relating to smoking and health was required for cigarette advertising. Pub.L. 89–92, § 5(a) and (b), 79 Stat. 283. The purpose of the FCLAA was to inform the public that smoking cigarettes may be hazardous to health and to ensure that commerce was not impeded by inconsistent regulations. Pub.L. 89–92, § 2, 79 Stat. 282. Section 5(c) of the Act expressly preserved "the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes." Pub.L. 89–92, § 5(c), 79 Stat. 283.

In 1966, the FTC began to rethink its ban on truthful claims of tar and nicotine content of cigarettes on packages and in advertising based on the health community's view that consumers should be encouraged to expose themselves to lower levels of tar and nicotine, which it considered better for health. *See* Miller Aff. ¶ 92 & Def.'s Ex. 78 at 6–13. The FTC, however, was still concerned about the absence of a standard method to test tar and nicotine levels, which could lead to manufacturers publishing misleading figures in order to secure a competitive advantage. Def.'s Ex. 78 at 11–12; *F.T.C. v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 37 (D.C.Cir.1985).

In March 1966, the FTC announced its reversal of its ban on representations of tar and nicotine yields in advertising. Miller Aff. ¶ 94 & Def.'s Ex. 78 at 6, Def.'s Ex. 105, and Def.'s Ex. 106. The FTC stated that it would not be a violation of law to make factual statements of tar and nicotine content, expressed in milligrams, of cigarettes so long as (1) no collateral representations are made to reduce or eliminate health hazards, and (2) the statement of tar and nicotine content is supported by tests conducted in accordance with the Cambridge Filter Method. Miller Aff. ¶ 94 & Def.'s Ex. 106.

In 1967, the FTC established a uniform test for analyzing tar and nicotine levels in cigarettes, known as the FTC Method or Cambridge Filter Method, and set up a laboratory to conduct the test itself. *See* Miller Aff. ¶ 17; *Brown & Williamson*, 778 F.2d at 36–37. The FTC Method used a smoking machine that takes a 35 milliliter puff on a cigarette for two seconds duration every 60 seconds until the cigarette is smoked to a specific butt length. *Brown & Williamson*, 778 F.2d at 37. The ma-

chine then collects and measures the tar and nicotine. *Id.* The test provides an objective basis for assessing the relative amounts of tar and nicotine of different cigarettes when smoked the same way. *Id.*

From its inception, the FTC knew that the test did not measure the amount of tar or nicotine an individual smoker may receive because that quantity depends on individual smoking behavior. *See Watson,* 420 F.3d at 855; *Brown & Williamson,* 778 F.2d at 37; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 9. In 1966, five cigarette companies pointed out the shortcomings of the FTC Method to the FTC, particularly as to how the FTC Method does not measure the amount of nicotine that any human being will draw from smoking a particular cigarette due to the varying ways smokers smoke, such as taking a different number of puffs, taking puffs of varying duration, and holding their cigarette in different ways. *See* Def.'s Ex. 141 at 1–3.

Nevertheless, the FTC concluded that the public interest in a standardized test to compare tar and nicotine levels in different brands outweighed the fact that the test does not measure the amount of tar and nicotine that an individual smoker will consume. *See* Def.'s Ex. 112 at 1–2; *Watson,* 420 F.3d at 855; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 9. The FTC believed that the "[u]se of more than one testing method would produce different results which would only serve to confuse or mislead the public." Def.'s Ex. 112 at 2. In its news release, the FTC expressed many of the limitations of the FTC Method: "[T]he purpose of testing is not to determine the amount of tar and nicotine inhaled by any human smoker, but rather to determine the amount of tar and nicotine generated when a cigarette is smoked by machine in accordance with the prescribed method." Def.'s Ex. 112 at 2.

On October 26, 1967, the FTC announced a clarification of their enforcement policy in regard to representations relating to tar and nicotine content of cigarettes. Miller Aff. ¶ 169 & Def.'s Ex. 124 & 207. The FTC stated that it would not challenge representations "where they are shown to be accurate and fully substantiated by tests conducted in accordance with the standardized testing methods and procedures used by the Federal Trade Commission." Def.'s Ex. 124 at 3. The FTC further clarified that a cigarette testing relatively high among the lowest in tar and nicotine yield should not be represented to be otherwise and that a cigarette testing relatively low in comparison with other brands may be so represented, provided that the basis for comparison is fully and fairly stated. *Id.*

The FTC's 1968 Report to Congress noted that cigarette manufacturers were using a number of descriptors in advertisements for taste, including the term "light." Miller Aff. ¶ 179 & Def.'s Ex. 98 at 14. The report also provided some of the reasons for the FTC's change in position on tar and nicotine disclosure: "Based upon the proposition that lower yield cigarettes present a lessened hazard to the American public, the Commission has acted within the past year to (1) augment information available to the public on the tar and nicotine content of cigarettes and (2) prompt cigarette manufacturers to develop less hazardous cigarettes." Miller Aff. ¶ 95 & Def.'s Ex. 98 at 17. In addition, the report confirmed: "On October 26, 1967, the Commission issued a policy statement which indicated that as a general rule the Commission would not challenge statements or representations of or relating to tar and nicotine content of cigarettes 'where they are shown to be accurately and fully substantiated by tests conducted in accordance with the standardized testing methods and procedures used by the

Federal Trade Commission'." Miller Aff. ¶ 170 & Def.'s Ex. 98 at 18.

In 1969, Congress amended the FCLAA in order to strengthen the warning label and to ban cigarette advertising in any medium of electronic communication subject to the jurisdiction of the FTC. *See* Pub.L. 91–222, §§ 4, 6, 84 Stat. 87 (1969). *See also Cipollone,* 505 U.S. at 515, 112 S.Ct. 2608. The 1969 amendment also replaced § 5(b) with the following preemption provision: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." Pub.L. 91–222, §§ 4, 6, 84 Stat. 87. The amended Act also provided that nothing in the Act "shall be construed to limit, restrict, expand, or otherwise affect the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes." Pub.L. 91–222, § 7(b), 84 Stat. 89.

In 1970, the FTC formally proposed promulgating a Trade Regulation Rule that would require cigarette advertisements to disclose tar and nicotine ratings, as determined by the FTC Method. Def.'s Ex. 126; *Watson,* 420 F.3d at 855; *Brown & Williamson,* 778 F.2d at 37. The proposed rule did not reference "lights" cigarettes or representations of "lowered tar and nicotine." *See* Def.'s Ex. 126; Pl.'s Ex. 3. The FTC postponed hearings on the proposed Trade Regulation Rule in order to allow the major cigarette manufacturers to tell the FTC how they would intend to voluntarily disclose tar and nicotine yields in advertising. Miller Aff. ¶ 107 & Def.'s Ex. 128. Although the initial proposal of the cigarette manufacturers to the FTC was rejected, eight major members of the cigarette industry subsequently agreed to a voluntary disclosure plan in which cigarette manufacturers would disclose the tar and nicotine figures in all advertising for their cigarettes, as determined by the FTC Method. *See* Miller Aff. ¶ 108 & Def.'s Ex. 131–33 & Def.'s Ex. 138 at 18–19; *Watson,* 420 F.3d at 855; *Brown & Williamson,* 778 F.2d at 37. The language used in the advertisements would be as follows:

___ mg. "tar", ___ mg. nicotine av. per cigarette, FTC Report (date).

or

___ mg. "tar", ___ mg. nicotine av. per cigarette by FTC method.

*See* Miller Aff. ¶ 194 & Def.'s Ex. 227 at TIMN 0069578–79.

Upon accepting the agreement, the FTC suspended the formal rulemaking proceedings. *See* Miller Aff. ¶ 108 & Def.'s Ex. 138 at 18–19; *Watson,* 420 F.3d at 855; *Brown & Williamson,* 778 F.2d at 37. The FTC stated it believed that the voluntary agreement would free up its manpower and funds to deal with other serious problems in cigarette advertising that otherwise would have been devoted to hearings and court proceedings. Def.'s Ex. 138 at 19. The FTC nonetheless announced that it retained the right to reschedule the Trade Regulation Rule proceedings at any time it deemed such action necessary in the public interest. Def.'s Ex. 133 at 1–2 & Def.'s Ex. 138 at 19.

By letter to the FTC dated September 2, 1969, the Code Authority of the National Association of Broadcasters asked the FTC whether it had formulated a policy regarding the use of words such as "low," "lower," and "reduced" in describing the tar and nicotine levels of cigarettes. *See AMERICAN BRANDS, INC.,* 1970 WL 117288, 77 F.T.C. 1623 (1970). The FTC clarified in a response letter to the Director of the Code Authority that advertisers could "almost always" avoid imprecision in use of such words and similar words by clearly and conspicuously disclosing the tar and nicotine content of the

advertised cigarette, the brand to which it was being compared, and the domestic cigarettes with the highest and lowest yields. *See id.* The FTC made this exchange of correspondence public. *See id.* In a subsequent FTC Order examining the propriety of having issued this letter, the FTC stated that it was "not required to restrict its role in making 'explicit the unexpressed standards of fair dealing' by precipitously abandoning the alternative methods of defining policy which are ordinarily available to it." *Id.* (internal footnote omitted). The FTC Order also said that the letter was its expression of its point of view on the policy issue. *Id.*

In September 1969, the FTC filed a complaint against American Brands, Inc., for falsely advertising its Pall Mall and Lucky Filters cigarettes as "lower in tar" when, in fact, its Pall Mall and Lucky Filters were 56th and 77th highest in tar among the 122 brands tested. *IN THE MATTER OF AMERICAN BRANDS, INC.*, 1971 WL 128779, 79 F.T.C. 255, 256–57 (1971). In 1971, the parties entered into a consent order in which American Brands, Inc., would cease and desist from the following:

> Stating in advertising that any cigarette manufactured by it, or the smoke therefrom, is low or lower in 'tar' by use of the words 'low,' 'lower,' or 'reduced' or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure of:
> 1. The 'tar' and nicotine content in milligrams in the smoke produced by the advertised cigarette; and
> 2. If the 'tar' content of the advertised brand is compared to that of another brand or brands of cigarette, (a) the 'tar' and nicotine content in milligrams of the smoke produced by that brand or those brands of cigarette, and (b) the 'tar' and nicotine content in milligrams of the lowest yield domestic cigarette.

*Id.* at 258–59. The consent order also defined the term "tar" as "the total particulate matter in the mainstream smoke of cigarettes as determined by the testing method employed by the [FTC] in its testing of the smoke of domestic cigarettes." *Id.* at 259. The order defined "nicotine" as the "total alkaloids as nicotine in the mainstream smoke of cigarettes as determined by the testing method employed by the [FTC] in its testing of the smoke of domestic cigarettes." *Id.* In its 1971 Report to Congress, the FTC described the consent order as part of its "[r]egulatory activity" for the year. Miller Aff. ¶ 187 & Def.'s Ex. 139 at 13–14; *Price*, 302 Ill.Dec. 1, 848 N.E.2d at 13. In that same report, the FTC noted that consent orders "carry the force of law." Def.'s Ex. 139 at 16; *Price*, 302 Ill.Dec. 1, 848 N.E.2d at 13.

In 1977, Lorillard, a cigarette manufacturer, developed a new ventilated filtration system for some of its cigarettes and asked the FTC to change the cigarette insertion depth in its FTC Method testing so that the machine's cigarette holders would not block the filtration system. Miller Aff. ¶ 114 & Def.'s Ex. 142. The FTC rejected Lorillard's request out of a concern that the change in insertion depth would cause a lack of continuity with previous test results. *See* Miller Aff. ¶¶ 116–17 & Def.'s Ex. 142 at 2.

In 1978, the FTC recommended in its Report to Congress that the Public Health Cigarette Smoking Act be amended to require that the tar and nicotine content of each cigarette, according to FTC Method testing, appear on all cigarette packages as well as in all cigarette advertising. Miller Aff. ¶ 109 & Def.'s Ex. 140 at 14. The FTC had made the same request in its 1967 Report to Congress. Miller Aff. ¶ 109 & Def.'s Ex. 99 at 30. Congress did not make the recommended amendment.

Miller Aff. ¶ 109. *See also* 15 U.S.C. § 1333.

In its 1979 Report to Congress, the FTC noted that it defined "low tar" as 15.0 mg. or less tar. Miller Aff. ¶ 174 & Def.'s Ex. 209 at 11 n. 8 & Def.'s Ex. 210 at 18 n. 11. The FTC stated, however, that it had not defined "ultra-low tar" or any other term other than "low tar." *Id.* Advertisers, however, were using a variety of terms to distinguish among tar levels. *Id.* Advertisers sometimes call cigarettes with 3 mg. tar or less "ultra low 'tar'" cigarettes. Def.'s Ex. 210 at 17–18. The FTC reported that advertising expenditures and sales of low tar cigarettes in 1979 had increased substantially over the previous year. Miller Aff. ¶ 174 & Def.'s Ex. 209 at 10. In 1980, the FTC reported that the market share of low tar brands of cigarettes had increased steadily from 2% in 1967 to 44.8% in 1980. Def.'s Ex. 210 at 17.

In 1981, the FTC published a staff report the purpose of which was to examine whether cigarette advertising adequately warns consumers of the health hazards of smoking and whether new action was needed. *See* Def.'s Ex. 100 at 2. The report discussed, among other things, the issue of compensation. Miller Aff. ¶ 138 & Def.'s Ex. 100 at 1–54—1–55. The report stated that there was evidence that smokers of "low tar" cigarettes compensate for the reduced level of nicotine by a number of methods, such as inhaling more often, inhaling deeper, smoking the cigarette closer to the filter, or smoking more cigarettes. *Id.* The report also discussed how the construction of many "low tar" cigarettes can result in a higher level of tar and nicotine intake than the FTC Method would suggest, because smokers cover tiny holes in the cigarette with their fingers or lips when smoking, which increases the level of tar and nicotine inhaled. *Id.* In regard to the meaning of "low tar," the staff report stated: "The

FTC formally defines a low "tar" cigarette as one that has 15.0 or less milligrams of "tar". As indicated in the table in fn. 178, the informal definition of "low tar" is changing." Def.'s Ex. 100 at 1–50 n. 175. The report also suggested that the FTC considered "ultra-low 'tar'" cigarettes as those having 6.0 mg. or less "tar." *See* Miller Aff. ¶ 175 & Def.'s Ex. 100 at 1–50.

In 1981, the FTC also investigated a claim that Brown & Williamson's Barclay cigarettes had a unique channel design that reduced tar yield in FTC Method testing but not when smoked by individuals. *See* Miller Aff. ¶¶ 119–22 & Def.'s Ex. 143. The FTC determined that the FTC Method did not adequately measure the tar and nicotine levels in the Barclay cigarettes as compared to other cigarettes and sought public comment on possible modifications to its test method. Miller Aff. ¶¶ 122–23 & Def.'s Ex. 143. When Brown & Williamson continued to advertise its tar yields as "1 mg. tar" according to "a recognized method used by B & W and supported by independent laboratories," the FTC filed suit against Brown & Williamson because the FTC asserted that the "1 mg. tar" claim deceptively led consumers to believe that Barclay's tar delivery was similar to that of other cigarettes rated 1 mg. tar by the FTC. *See F.T.C. v. Brown & Williamson Tobacco Corp.,* 580 F.Supp. 981, 984 (D.D.C.1983). Brown & Williamson countered that the FTC Method is itself misleading because smokers "compensate" by changing their smoking behavior to ingest more tar and nicotine from low-rated cigarettes than the FTC rating system would suggest. *Id.* at 984–85. The district court rejected Brown & Williamson's argument, finding that the FTC Method, while in need of improvement, provides legitimate comparative information to consumers and that Brown & Williamson's "1 mg. tar" claim was deceptive. *Id.* at 986, 989. The district court there-

fore enjoined Brown & Williamson from advertising with any claim of a specific milligram tar content rating, unless the rating was approved by the FTC or derived using an FTC-approved testing methodology. *Id.* at 990.

Upon review, the D.C. Circuit affirmed in part, but remanded to the district court to modify the injunction to allow for the presentation of results of a different testing system, so long as any advertisement provides sufficient data to avoid deceptiveness due to confusion with the FTC testing system. *Brown & Williamson,* 778 F.2d at 36–37, 45. In so doing, the D.C. Circuit explained: "Because the FTC has not adopted its system of testing pursuant to a Trade Regulation Rule under section 18 of the FTC Act, 15 U.S.C. § 57a (1982), one cannot say that the FTC system constitutes the only acceptable one available for measuring milligrams of tar per cigarette." *Id.* at 44. The circuit court placed the burden on the FTC of demonstrating any deceptiveness of results obtained and advertised under any such new testing system. *Id.* at 45.

On April 13, 1983, during the Barclay cigarette litigation, the FTC requested public comment on possible testing modifications for tar and nicotine content in cigarettes. 48 Fed.Reg. 15953, 15953–55. The FTC reiterated that its testing data were for comparative purposes only, noting that smoking patterns and smoking more cigarettes can result in a greater tar and nicotine intake than the FTC Method test results would suggest. *See id.* at 15954. The FTC received a number of public comments, but no clear consensus emerged as to how to modify the FTC's testing method. Miller Aff. ¶ 144 & Def.'s Ex. 79 at 7. Accordingly, at that time, the FTC did not change its test method to address compensatory smoking. *Id.*

Congress again amended the FCLAA in 1984 through the Comprehensive Smoking Education Act, Pub.L. 98–474, 98 Stat. 2200 (1984). The 1984 amendment once again changed the federally mandated warnings, re-designated sections, added a section relating to cigarette ingredients, and made a few additional amendments. Pub.L. 98–474, 98 Stat. 2200, 2201–05.

In May 1987, the FTC Bureau of Protection Director at the time, William MacLeod, testified during a congressional hearing about the status of the FTC testing laboratory. *See* Pls.' Ex. 9 at 47. Mr. MacLeod stated that the cigarette companies were not required by law or regulation to use the FTC Method. *Id.* at 7. Mr. MacLeod also testified that there was "no assurance" that the cigarette companies would continue to include tar and nicotine content in their advertisements, but that the industry had followed a pattern for 20 years of following the voluntary agreement. *See id.* at 46–47.

The FTC closed its testing laboratory in 1987, but nonetheless continued to require cigarette manufacturers to test cigarettes using the FTC Method. Miller Aff. ¶ 101 & Def.'s Ex. 123 at 1–2; 62 Fed.Reg. 48158 n. 5. The FTC transferred testing to the Tobacco Institute Testing Laboratory. Miller Aff. ¶ 101 & Def.'s Ex. 123 at 1–2; 62 Fed.Reg. 48158 n. 5.

In 1988, two Congressmen introduced a bill that would have repealed the FCLAA preemption clauses by allowing state law claims despite compliance with the FCLAA. *See* Miller Aff. ¶ 224–25 & Def.'s Ex. 240 (H.R.4543). The FTC expressed reservations with the bill since state action could result in inconsistent health warnings, undermine the Surgeon General warnings, and make it difficult to advertise cigarettes on a national basis, which could effectively operate as an advertising ban, which the FTC did not generally favor. Miller Aff. ¶¶ 227–28 & Def.'s Ex. 242, 244.

The proposed bill was not enacted. *See* 15 U.S.C. § 1334.

In 1992, the Coalition on Smoking OR Health petitioned the FTC to issue a complaint against the major tobacco companies who advertise cigarettes as low tar, light, ultra low tar, or lower in tar, terms which misleadingly imply that the cigarettes are safe or safer than other brands of cigarettes. *See* Miller Aff. ¶ 195 & Def.'s Ex. 179 at 1–2. The petition also asserted that low-yield brands may even increase the health risk for smokers who compensate for reduced nicotine intake by increasing the number of cigarettes smoked per day, the frequency of puffing, and the depth and duration of inhalation. Def.'s Ex. 179 at 2. Although the FTC investigated the petition, it took no formal action against the cigarette companies and did not change its policy on the use of the term "lights." *See* Miller Aff. ¶ 146, 198 & Def.'s Ex. 181 at 484–95, Def.'s Ex. 37 at 55, 68.

On July 20, 1994, the FTC chairman wrote a letter to the National Cancer Institute ("NCI") asking that it consider convening a conference to address issues relating to the FTC testing methods and rating system. Miller Aff. ¶ 148 & Def.'s Ex. 184 & Ex. 37 at 64. The FTC requested that the NCI consider a number of issues, including compensation effects, the FTC testing methodology, and the potential health benefits of lower tar cigarettes. *Id.* In particular, the FTC suggested the following topics: "are low-tar cigarettes (cigarettes rated at 15 mg. or less of tar) less dangerous than high-tar cigarettes (those rated at more than 15 mg. of tar) and, if so, what is the extent of their health benefit?" and "are ultra low-tar cigarettes (cigarettes rated at 6 mg. or less of tar) less dangerous than low-tar and/or high-tar cigarettes and, if so, what is the extent of their health benefit?" Miller Aff. ¶ 176 & Def.'s Ex. 184 at 4.

The NCI ad hoc expert committee held a conference in December 1994. *See* Miller Aff. ¶ 149 & Def.'s Ex. 79 at vi; *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 18. Following the conference, the committee reached a number of conclusions, including the following: (1) the smoking of low-yield cigarettes has a small effect in reducing the risk of cancer, no effect on the risk of cardiovascular diseases, and an uncertain effect on the risk of pulmonary disease; (2) smokers who switch to lower tar cigarettes frequently change their smoking behavior in a way that may negate potential health benefits; (3) the system should measure and publish a range of tar, nicotine, and carbon monoxide yields that smokers should expect from each cigarette; and (4) classifications such as "light" and "ultralight" represent health claims and should be regulated and accompanied with an appropriate disclaimer. Def.'s Ex. 79 at vi-vii. Following the conference, and despite the recommendation, the FTC did not adopt a rule or take other regulatory action to require disclaimers for light and low tar descriptors. *Price,* 302 Ill.Dec. 1, 848 N.E.2d at 18.

Also in 1994, the FTC again challenged a company's cigarette advertisements when the FTC filed a complaint against American Tobacco Company for advertisements indicating that 10 packs of their Carlton cigarettes had less tar than one pack of a competing brand or brands. *IN THE MATTER OF THE AMERICAN TOBACCO CO.,* 1995 WL 17012576, 119 F.T.C. 3, 3–4 (1995). The FTC asserted that the advertisements were misleading because they indicated that consumers would get less tar by smoking 10 packs of Carlton cigarettes than by smoking a single pack of the other brands depicted when, in truth, the ratings were based on smoking machine tests that did not reflect actual smoking or take into account compensatory smoking behavior. *Id.* at 4. In

1995, the FTC and American Tobacco Company entered into a consent agreement in which American Tobacco Company would cease and desist from representing, through tar ratings of its brands of cigarettes as a numerical multiple, fraction, or ratio of the tar of any other brand of cigarettes, or through visual depictions of ten packs of any of its brands versus one pack of any other brand, that consumers will get less tar by smoking ten packs of any cigarette rated as having 1 mg. of tar than by smoking a single pack of any other brand of cigarettes rated as having more than 10 mg. of tar. *Id.* at 9–10. The order clarified, however, that American Tobacco Company could present in its advertisements representations that its brand was "low," "lower," or "lowest" in tar and/or nicotine so long as no more than a single cigarette or pack of its brand was visually depicted versus a single cigarette or pack of any other brand. *Id.* at 11.

In 1997, the FTC solicited public comments on proposed revisions to the FTC Method as well as on alternative approaches to testing. Cigarette Testing, Request for Public Comment, 62 Fed.Reg. 48,158 (Sept. 12, 1997). In its solicitation, the FTC explained the limitations of the FTC Method due to changes in cigarette design and compensatory smoking behavior. *Id.* at 48,159. The FTC also noted its concern that consumers may believe the existing method indicates how much tar and nicotine they will get from a particular cigarette and that consumers may fail to understand that the amount of tar and nicotine intake depends on how a cigarette is smoked. *Id.* The FTC also expressed concern that consumers may underestimate the health risk associated with smoking lower-rated brands. *Id.*

The FTC solicitation also requested public comment on the use of cigarette descriptors. *Id.* at 48,163. Although noting that terms like "low tar," "light," and "ul-

tra light" have no official definitions, the FTC stated that the cigarette industry uses the terms to reflect ranges of FTC tar ratings. *Id.* The solicitation stated that generally the term "low tar" means a tar rating of 7 to 15 milligrams and that the term "ultra low tar" means a tar rating of 6 milligrams or less. *See id.* In the solicitation, the FTC grouped the terms "light" and "low tar" together when asking whether consumers believe they will get significantly less tar from such cigarettes than regular cigarettes, and the FTC grouped the terms "ultra low tar" and "ultra light" together when asking if consumers believed they will get less tar from such cigarettes than from "light" or "low tar" cigarettes. *See id.* Among other things, the FTC requested comment on whether there was a need for official guidance with respect to the terms used in marketing lower-rated cigarettes. *Id.* Following the FTC solicitation, the FTC received numerous and varied public comments. *See* Miller Aff. ¶ 158 & Def.'s Ex. 192–95.

On November 24, 1998, Senator Frank Lautenberg wrote a letter to the FTC to urge it to begin a proceeding to disallow the use of "Light" or "Ultra Light" terms in cigarette advertisements or the listing of tar and nicotine ratings on their products or in advertisements until an accurate system measuring the health implications of cigarettes is established. Miller Aff. ¶ 207 & Def.'s Ex. 230. The same day the FTC issued a press release in response to Senator Lautenberg's letter stating that it was still evaluating problems with the FTC Method. *See* Miller Aff. ¶ 208 & Def.'s Ex. 231.

In 1999, the FTC issued its Report to Congress for 1997. Def.'s Ex. 197. The report stated that since 1968 the average sales-weighted machine-measured tar yield had fallen from 21.6 mg. to 12.0 mg., and that in 1997, 70% of all cigarettes sold had

machine-measured tar yields of 15 mg. or less. *Id.* at 3. Despite these figures, the FTC noted its concern that the FTC Method may be misleading due to cigarette design changes and compensatory smoking behavior and that low-yield cigarettes may not be less harmful than higher-rated ones. *Id.* at 3–5. The FTC noted that, because of these concerns, it had requested that the Department of Health and Human Services ("HHS") conduct a review of the FTC Method. Miller Aff. ¶ 158 & Def.'s Ex. 197 at 5. The report also recommended that Congress consider giving authority over cigarette testing to one of the federal government's science-based, public health agencies. Miller Aff. ¶ 158 & Def.'s Ex. 197 at 6.

In 2001, the HHS released a study entitled "Monograph 13: Risks Associated with Smoking Cigarettes with Low Machine–Measured Yields of Tar and Nicotine." Pl.'s Expanded Combined Resp., Ex. 2; Miller Aff. ¶ 159 & Def.'s Ex. 198. The study concluded, among other things, that FTC Method measurements do not offer smokers meaningful information of the tar and nicotine they will receive from a cigarette or as to the relative amounts of exposure from smoking different brands of cigarettes. Pl.'s Expanded Combined Resp., Ex. 2 at 10. The study reported that changes in cigarette design that reduced machine-measured tar yields also led to a disassociation between the FTC Method yield and the amount of tar and nicotine actually received by the smoker. *Id.*, Ex. 2 at 1. The study also concluded: "Internal tobacco company documents demonstrate that the cigarette manufacturers recognized the inherent deception of advertising that offered cigarettes as "Light" or "Ultra–Light," or as having the lowest tar and nicotine yields." *Id.*, Ex. 2 at 233. The study also noted that ciga-

rette brands yielding approximately 1–5 or 6 mg. tar by the FTC Method are generally called "Ultra–Light;" brands yielding between 6 or 7–15 mg. tar are called "Light;" and brands yielding more than 15 mg. tar are called "Regular" or "Full Flavor." Miller Aff. ¶ 177 & Def.'s Ex. 202 at 13. "By convention, cigarettes yielding 15 mg. tar by the FTC method are called 'low tar.'" *Id.* In a press release, the FTC stated that Monograph 13 represented the first step in HHS's response to the FTC's request for review of the FTC Method. Miller Aff. ¶ 159 & Def.'s Ex. 198 at 1.

**B. Philip Morris, Marlboro Lights, and Cambridge Lights**

Defendant Philip Morris has manufactured Marlboro Lights cigarettes since 1971 and has manufactured Cambridge Lights cigarettes since 1986. Pls.' Second Am. Compl. ¶ 6; Def. Philip Morris' Answer (Doc. No. 38), ¶ 6. Philip Morris has distributed and sold Marlboro Lights and Cambridge Lights throughout the United States, including New Mexico. Pls.' Second Am. Compl. ¶ 7; Def. Philip Morris' Answer, ¶ 7. Plaintiffs purchased and smoked Marlboro Lights cigarettes. *See* Def.'s Ex. A (Mulford Dep.) at 15–16; Def.'s Ex. B (Newby Dep.) at 94; Def.'s Ex. C (Fox Dep.) at 55; and Def.'s Ex. D (DeLuna Dep.) at 74, 104.

Both Marlboro Lights and Cambridge Lights packages contain the word "Lights," and until the beginning of 2003, Marlboro Lights packages contained the words "lowered tar and nicotine." Def. Philip Morris' Answer, ¶ 8. Every package of Marlboro Lights and Cambridge Lights purchased by Plaintiffs in New Mexico contained the FCLAA's federally mandated Surgeon General's health warning. *See* Def.'s Express Preemption Mot., Undisputed Fact 2.[2] Marlboro Lights cigarette

---

2. Plaintiffs state that they "deny each of Defendant's purportedly undisputed facts." Pls.'

Expanded Combined Resp. at 5. The Court, however, could not identify any evidence from

packages, however, have never contained numerical information concerning tar and nicotine yields. Pls.' Expanded Combined Resp., Ex. 5 at 7.

Plaintiffs interpreted the words "lights" and "lowered tar and nicotine" on Marlboro Lights packages as meaning that Marlboro Lights cigarettes were "safer," "less harmful," or "less hazardous" than regular cigarettes. Def.'s Ex. A at 107, 117–18; Def.'s Ex. B at 68–69; Def.'s Ex. C at 55, 92, 171–72, 180–81; Def.'s Ex. D at 104, 140. Plaintiffs allege that Philip Morris' use of the terms "Light," "Lights," or "Lowered in Tar and Nicotine" in advertising its Marlboro Lights and Cambridge Lights cigarettes constitute misrepresentations. *See, e.g.,* Def.'s Ex. E at 11. Plaintiffs Mulford, Newby, and Fox felt that if Marlboro Lights packages contained an additional warning stating that they were not safer or less hazardous than regular cigarettes, then the warning would have prevented them from thinking that Marlboro Lights were safer than regular cigarettes. Def.'s Ex. A at 183, 187–88; Def.'s Ex. B at 198–202; Def.'s Ex. C at 192–95. Plaintiffs also acknowledged that Marlboro Lights feel and taste lighter when smoked as compared to regular cigarettes. *See* Def.'s Ex. A at 15–17, 107; Def.'s Ex. B at 94–95; Def.'s Ex. C at 94; Def.'s Ex. D at 27–28, 74.

A summary in a March 1, 1974 internal Philip Morris report described compensation—that people smoke in a way to get more intake than predicted by a machine. *See* Pls.' Expanded Combined Resp., Ex. 6 at CKT001064. The report concluded that the FTC Method for cigarette testing should be retained because it gives low numbers and permits comparison between brands. *Id.* at CKT001065. Six days la-

ter, on March 7, 1974, R. Fagan of Philip Morris sent an internal office correspondence entitled, "Moral Issue on FTC Tar." Pls.' Expanded Combined Resp., Ex. 7. The author stated that he did not believe that there was a moral reason to reveal to the FTC that cigarette smokers may be getting more tar than the FTC Method suggested based on a number of reasons, including (1) that it was already known that smokers could vary their intake and (2) that all the FTC was trying to do with the publicized numbers was offer a comparison between cigarettes where the puffing behavior remains constant. *See id.*

On September 17, 1975, an internal Philip Morris memorandum was prepared entitled, "Marlboro—Marlboro Lights Study Delivery Data." Pl.'s Expanded Combined Resp., Ex. 1. The internal memorandum states that Marlboro Lights cigarettes were not smoked like regular cigarettes: smokers took larger puff volumes on Marlboro Lights. *Id.* at 1. The memorandum concluded that smokers of Marlboro Lights "did not achieve any reduction in smoke intake." *Id.* at 3.

Following the NCI's release of Monograph 13, Philip Morris on September 18, 2002, petitioned the FTC to promulgate rules governing the following: "(1) the disclosure of average tar and nicotine yields of cigarette brands, (2) the use of disclaimers with respect to average tar yield and the health effects of 'low-yield' cigarettes, and (3) the use of descriptors, such as 'light' and 'ultra light.'" Pls.' Expanded Combined Resp., Ex. 12 at 1 (footnote omitted). Philip Morris requested that the FTC require disclosure of tar and nicotine yields by the FTC Method or an alternative testing method, if adopted, and re-

Plaintiffs to contest a number of Defendant's "Undisputed Facts," including the majority of the history of FTC and congressional action in the cigarette industry. Therefore, where the Court cites to "Def.'s Undisputed Fact," the Court has determined that Plaintiff has not adequately shown that the fact is in dispute.

quire that any such disclosure be accompanied by disclaimers that the amount of tar delivered depends on how a person smokes, that smokers may intake more tar and nicotine than estimated by the FTC Method, that low-tar cigarettes have not been established to be safer than other cigarettes, and that smoking low-tar cigarettes does not make it easier to quit smoking. *Id.* at 5–6. Finally, Philip Morris asked the FTC to promulgate regulations to require descriptors to be used in a uniform manner throughout the industry and to be defined by specific tar and nicotine ranges. *Id.* at 6.

On November 14, 2005, Philip Morris expressed its position supporting passage of legislation that would give the U.S. Food and Drug Administration ("FDA") authority to broadly regulate tobacco products. Pls.' Expanded Combined Resp., Ex. 10 at 1. Philip Morris stated its support for the bill, which purportedly gave the FDA authority to regulate, or ban, terms such as "light" and "low tar." *Id.*

FTC reports of tar and nicotine contents of cigarettes beginning in 1972 and through 2005 demonstrate that Marlboro Lights cigarettes have consistently tested below 15 mg. tar according to the FTC Method. *See* Def.'s Ex. 1–32. Beginning with the December 1988 FTC report, Cambridge Lights cigarettes also tested consistently below 15 mg. tar according to the FTC Method. *See* Def.'s Ex. 17–32.

### C. Plaintiffs' Second Amended Complaint

Plaintiffs filed their Second Amended Class Action Complaint and Jury Demand ("Second Amended Complaint") on December 28, 2005. (Doc. No. 33). In the only remaining count,[3] Plaintiffs allege that De-

fendants violated the UPA through the following acts:

a. Falsely and/or misleadingly representing that their product is "light" and/or delivers "lowered tar and nicotine" in comparison to regular cigarettes;

b. Designing cigarettes to register lowered tar and nicotine levels under machine testing conditions while actually delivering higher levels of these compounds when smoked by consumers, thereby rendering the "light" product descriptor deceptive and misleading;

c. Fraudulently concealing the true nature of their "Lights" cigarettes from Plaintiffs;

d. Fraudulently concealing the matters set forth herein, including the facts, memos, and admissions contained within their own files, including information relating to the facts that people do not smoke like the testing machine . . . ; that people smoke in such a way that they get much more than predicted by the machine—i.e., they compensate; and that measured resistance to draw on unlit cigarettes is far from what the smoker experiences as he or she puffs a cigarette;

e. Placing ventilation holes on the filter of light cigarettes that are covered or blocked by the smoker's lips of fingers under normal use, thereby negating the represented effects of the light brand;

f. Manipulating the nicotine levels in their "light" cigarettes;

g. Employing techniques that purportedly reduce machine-measured levels of tar in their Cambridge Lights and Marlboro Lights cigarettes . . . ; and

---

**3.** Plaintiffs stipulated to a voluntary dismissal without prejudice of their Counts II and III. *See* Stipulation and [Proposed] Order Dismissing Counts II and III of the Second Amended Complaint (Doc. No. 55, filed May 12, 2006).

·h. Manipulating the design of their Cambridge Lights and Marlboro Lights cigarettes ... in such a way that resulted in delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendants represent by use of the "light" product descriptor.

Second Am. Compl. ¶ 45. Plaintiffs seek economic and punitive damages and disclaim any claim for damages for personal injuries. *Id.* ¶¶ 52–54.

## III. STANDARD

Summary judgment is appropriate only if " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.,* 52 F.3d 1522, 1527 (10th Cir.1995) (quoting Fed.R.Civ.P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted). Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. 2505.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir.1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.; Kaus v. Standard Ins. Co.,* 985 F.Supp. 1277, 1281 (D.Kan. 1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The Court will consider Defendant's motions in light of these standards.

## IV. DISCUSSION

### A. Express Preemption

On May 5, 2006, Defendant Philip Morris filed a motion for summary judgment, asserting that Plaintiff's UPA claim must be dismissed because it is preempted by the FCLAA's express preemption provision set forth in 15 U.S.C. § 1334(b). Philip Morris alternatively argues for partial summary judgment as to all aspects of Plaintiffs' claim that are preempted, specifically any failure to warn and omission theory of liability under the UPA. Plaintiffs, on the other hand, contend that their UPA claim is a fraudulent misrepresentation claim arising from false statements of material fact made in advertisements, which the Supreme Court specifically held was not expressly preempted in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion).

Congress expressly stated its twin purposes in enacting the FCLAA: (1) to inform the public of the adverse health effects of cigarette smoking and (2) to protect commerce and the national economy from interference due to "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." 15 U.S.C. § 1331. To accomplish the first purpose, the

FCLAA prescribes specific, rotating warnings that must appear on all cigarette packages and advertising. *See* 15 U.S.C. § 1333. In light of the second purpose, Congress prohibited any other statement relating to smoking and health from being required on any cigarette package. 15 U.S.C. § 1334(a). Congress also included in the FCLAA the following preemption provision as to "State regulations": "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b).

■ The fact that Congress provided an express preemption clause supports a reasonable inference that it did not intend to preempt matters outside the clause, and thus, the task of courts "is to identify the domain expressly pre-empted" by the clause. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001). Congressional purpose is the "ultimate touchstone" of the court's inquiry. *Id.* (quoting *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608). Courts must follow the assumption that a federal act does not supersede the States' historic police powers unless that is the clear and manifest purpose of Congress. *Id.* at 541–42, 121 S.Ct. 2404. The court's analysis thus begins with the language of the statute, and the court must give meaning to each element of the express preemption provision. *Id.* at 542, 121 S.Ct. 2404.

■ In *Cipollone,* the Supreme Court addressed the language and scope of the FCLAA's preemption provision. 505 U.S. at 520–30, 112 S.Ct. 2608. First, the Court noted that the amended preemption provision sweeps much broader than its predecessor provision such that the phrase "[n]o requirement or prohibition" indicates "no distinction between positive enactments

and common law." *Id.* at 521, 112 S.Ct. 2608. The Court thus concluded that it must look at each common-law claim to determine individually whether each is preempted. *Id.* at 523, 112 S.Ct. 2608. The central inquiry for the courts is "whether the legal duty that is the predicate of the common-law damages action constitutes a 'requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." *Id.* The Court explained that each phrase within the preemption clause "limits the universe of common-law claims pre-empted by the statute." *Id.*

The plurality in *Cipollone* then examined each of the plaintiff's claims in turn. As relevant here, the Court determined that the plaintiff's failure-to-warn claims were preempted to the extent they required a showing that the cigarette manufacturers' post–1969 advertising or promotions should have included additional, or more clearly stated, warnings. *Id.* at 524, 112 S.Ct. 2608. To the extent that the failure-to-warn claims were based on the defendants' testing or research practices, however, those claims were not preempted because they were unrelated to advertising or promotion. *Id.* at 524–25, 112 S.Ct. 2608.

As to the plaintiff's fraudulent misrepresentation claims, the Court determined that the plaintiff alleged two distinct theories: (1) that the cigarette manufacturers, through their advertising, neutralized the effect of federally mandated warning labels, and (2) that the cigarette manufacturers committed intentional fraud and misrepresentation by false representation of a material fact and by concealment of a material fact. *Id.* at 527–28, 112 S.Ct. 2608. In holding that the FCLAA preempts the first theory, the Court explained that the

claim was predicated on a state-law prohibition against statements in advertising that tend to minimize the health hazards of smoking and that the FCLAA preempts both requirements and prohibitions. *Id.* at 527, 112 S.Ct. 2608. The Court stated that such a prohibition was merely the converse of a state-law requirement that warnings be included. *Id.* The Court also reasoned that the first theory of fraudulent misrepresentation was inextricably related to the failure-to-warn theory, which the FCLAA also precluded. *Id.* at 528, 112 S.Ct. 2608. Unlike the first theory of fraudulent misrepresentation, the Court ruled that the predicate of the second theory was a state-law duty not to make false statements of material fact or to conceal such facts. *Id.* The Court concluded that claims for false representation "are predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608. The Court also stated that state-law intentional fraud claims do not create diverse and confusing standards because they rely on the single, uniform standard of falsity. *Id.* at 529, 112 S.Ct. 2608.

Philip Morris argues that each phrase within the preemption clause is met in this case because Plaintiffs' UPA claim is predicated on New Mexico state-law requirements or prohibitions with respect to Philip Morris' advertising or promotion of Marlboro Lights and Cambridge Lights cigarettes based on concerns about smoking and health. Philip Morris contends that each of Plaintiffs' theories underlying its UPA claim is inextricably related to the failure-to-warn theory that the *Cipollone* Court determined was preempted by the FCLAA. Plaintiffs, on the other hand, assert that their claim is based on the theory of intentional fraudulent misrepresentation that the Supreme Court concluded was not preempted by the FCLAA. Plaintiffs argue that their claim is based

on a duty not to deceive and is not based on smoking and health. Plaintiffs contend that they are not asserting warning neutralization or omission claims.

As *Cipollone* instructs, this Court must analyze the substance and theories behind Plaintiffs' claim. Plaintiffs' sole claim is for violation of the UPA, NMSA § 57–12–1 *et seq.* As relevant here, the UPA makes it unlawful to conduct trade or commerce using unfair or deceptive trade practices. NMSA § 57–12–3. The statute defines "unfair or deceptive trade practice" as "any false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale … of goods … by any person in the regular course of his trade or commerce, which may, tends to or does deceive or mislead any person…." NMSA § 57–12–2(D). Plaintiffs allege that Philip Morris violated the act by, among other things, falsely and misleadingly representing that Marlboro Lights and Cambridge Lights cigarettes are "light" and/or deliver "lowered tar and nicotine" and fraudulently concealing the true nature of their "Lights" cigarettes. *See* Second Am. Compl. ¶¶ 44–45.

The Court finds that Plaintiffs have alleged a UPA claim based on a theory of false representation of a material fact. The Court finds no basis to distinguish Plaintiffs' UPA claim of false representation from the false representation of a material fact claim in *Cipollone* that the Supreme Court concluded was based on a duty not to deceive. The Court therefore concludes that Plaintiffs' UPA claim based on the theory of false representation rests on a duty not to deceive and not on a duty "based on smoking and health," and thus, is not expressly preempted by the FCLAA *Cf. Cipollone,* 505 U.S. at 528–29, 112 S.Ct. 2608. *See also Spain v. Brown & Williamson Tobacco Corp.,* 363 F.3d 1183,

1201–02 (11th Cir.2004) (FCLAA does not expressly preempt state law claim of conspiracy to fraudulently misrepresent dangers of cigarettes, insofar as claim is based on allegation that defendants made statements knowing their falsity); *Brown v. Brown & Williamson Tobacco Corp.*, 2005 WL 2243466 (W.D.La. Sept. 14, 2005) (unpublished opinion) (plaintiff's claim for fraud and misrepresentation under Louisiana's Unfair Trade Practices and Consumer Protection Act was not expressly preempted because it was based on general duty not to deceive, not on "smoking and health"); *U.S. v. Philip Morris, Inc.*, 263 F.Supp.2d 72, 75, 80–81 (D.D.C.2003) (RICO claims based on charges that defendants intentionally misled consumers about hazards of their products, including use of "light" and "low tar/low nicotine" cigarettes, are predicated on duty not to deceive and, thus, are not preempted by FCLAA); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F.Supp.2d 167, 170–71, 175 (D.Conn.2000) (refusing to construe plaintiff's false representation claim under Connecticut Unfair Trade Practices Act into failure-to-warn or warning neutralization claim and concluding that false representation claim based on fraudulent statements about health hazards and addictive nature of cigarettes arose from duty not to deceive and was not expressly preempted by FCLAA); *Price*, 302 Ill.Dec. 1, 848 N.E.2d at 33 (construing nearly identical "lights" claim as "a pure case of consumer fraud" and rejecting defendant's attempt to cast plaintiffs' claim as failure-to-warn or warning neutralization claim); *Aspinall v. Phillip Morris Companies, Inc.*, 2006 WL 2971490, *11 (Mass.Dist.Ct. Aug. 9, 2006) (unpublished opinion) (state-law claim for unfair or deceptive acts based on use of "lights" and "lowered tar and nicotine" being deceptive given actual amount of tar and nicotine smokers receive not expressly preempted because predicate legal duty is duty not to deceive). This ruling conforms with the Supreme Court's conclusion that Congress intended the phrase "based on smoking and health" to be construed narrowly "so as not to proscribe the regulation of deceptive advertising." *See Cipollone*, 505 U.S. at 529, 112 S.Ct. 2608.

Philip Morris attempts to circumvent the holding of *Cipollone* by converting Plaintiffs' stated claim into a failure-to-warn and/or warning neutralization claim. To be sure, to the extent Plaintiffs' claim rests on theories of failure-to-warn or warning neutralization, those theories are preempted. *See Cipollone*, 505 U.S. at 524–25, 527–29, 112 S.Ct. 2608. The Court agrees with Philip Morris that Plaintiffs' UPA claim based on a theory of fraudulent concealment—that Philip Morris fraudulently concealed the true nature of their "Lights" cigarettes and other information—is nothing more than a failure-to-warn theory, as the theory is predicated on a duty to warn consumers of the concealed information. Therefore, to the extent Plaintiffs' UPA claim rests on a theory of fraudulent concealment, that claim is expressly preempted. *Cf. Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 171 (5th Cir.1996) (fraudulent concealment claim based on concealing information on health risks of smoking preempted by FCLAA); *Waterhouse v. R.J. Reynolds Tobacco Co.*, 270 F.Supp.2d 678, 684–85 (D.Md.2003) (fraudulent concealment claim against cigarette manufacturer nothing more than failure-to-warn claim in different dress); *Small v. Lorillard Tobacco Co., Inc.*, 252 A.D.2d 1, 679 N.Y.S.2d 593, 603–04 (N.Y.App.Div.1998) (fraudulent concealment claims based on failure to warn of dangers of nicotine expressly preempted but claims based on affirmative misrepresentations not preempted). *See also Spain*, 363 F.3d at 1200 (claim of conspiracy to fraudulently suppress information about dangers of smoking is expressly preempted by FCLAA because un-

derlying cause of action equates with duty to warn through advertising or promotion).[4] Any theory of Plaintiffs that the terms "lights" or "lowered in tar and nicotine" minimized the health hazards associated with smoking is also expressly preempted. Plaintiffs' Second Amended Complaint, however, can be fairly read to state an additional theory of false representation of material facts—that the terms "lights" and "lowered in tar and nicotine" are false and misrepresent the facts. Such a claim arises from a duty not to deceive and is not expressly preempted. This Court is not free to convert that claim into something that it is not.

In arguing that Plaintiffs' claim is more like the preempted warning neutralization claims, Philip Morris argues that Plaintiffs' claim is premised on implied misrepresentations. Philip Morris contends: " 'Smoking cures cancer' is an *actual* false statement; whereas the deception alleged in Plaintiffs' claim here involves the *impression* of safety that Plaintiffs *inferred* from the challenged descriptors." Def.'s Reply (Doc. No. 66) at 10. Philip Morris argues that because the terms here are not affirmative misstatements of fact, Plaintiffs' claims are preempted. Plaintiffs, however, have alleged that the terms "light" and "lowered tar and nicotine" *are* false and misleading. The predicate of Plaintiffs' claim is that the terms themselves are deceiving because the cigarettes are not, in fact, light or lowered in tar and nicotine. Philip Morris asserts that the terms are not inherently false because "light" conveys taste and the cigarettes are lower in tar and nicotine than full flavor cigarettes

according to the FTC Method. However, whether or not Plaintiffs can prove their claim is a separate question from whether the claim itself is preempted. Even in Philip Morris' "Smoking cures cancer" example, the statement is only actually false when the plaintiff has proven it false through proof. Philip Morris' argument therefore goes not to a preemption defense but rather to the merits of the claim itself. Courts do not determine whether a plaintiff can succeed on the merits of the fraud claim before determining whether the fraud claim itself is preempted. *Cf. Price*, 302 Ill.Dec. 1, 848 N.E.2d at 36–37 (stating that whether terms "lights" and "lowered tar and nicotine" are deceptive "goes to the merits of the fraud claim, not to the threshold question of exemption"). As *Cipollone* indicates, the focus is not on whether the plaintiff can prove the falsity of the statement, but rather what is the predicate for the duty not to make the false statement—here, the duty not to deceive. As Philip Morris' motions for summary judgment are based solely on preemption, this Court declines to address the merits of Plaintiffs' UPA claim at this juncture.

The Court also recognizes that Plaintiffs' fraud claim is related to smoking and health in that the alleged deceptive advertising of the terms "lights" and "lowered tar and nicotine" could create a false impression of the health effects of smoking, but it does not necessarily follow that the predicate duty is based on smoking and health and not on another more general duty. The Supreme Court in *Cipollone*

---

**4.** Plaintiffs have not indicated to the Court that their fraudulent concealment claim is based on a state law that obliges Philip Morris to disclose material facts about smoking and health to an administrative agency or other similar channel of communication. Nor does the record reflect support for such a claim. Therefore, under *Cipollone*, Plaintiffs' fraudu-

lent concealment theory is preempted. *See Cipollone*, 505 U.S. at 528, 112 S.Ct. 2608 (fraudulent concealment theory not preempted only insofar as theory relies on state-law duty to disclose such facts through channels of communication other than advertising or promotion).

explicitly held that the predicate duty for an intentional fraud claim arises from the general duty not to deceive. The non-preempted claims in *Cipollone* certainly also had a relationship to the health effects of smoking, as they were based on allegations that the defendants misrepresented material facts concerning the health hazards of smoking, and conspired to do so. *See Cipollone,* 505 U.S. at 510, 528–30, 112 S.Ct. 2608. The Supreme Court nevertheless concluded that the predicate duties for the false representation and conspiracy to misrepresent claims were not "based on smoking and health" but rather on respective duties not to deceive and not to conspire to commit fraud. *See id.* at 528–30, 112 S.Ct. 2608.

This Court is also not persuaded that *Reilly* compels a different result. In *Reilly,* the Massachusetts Attorney General promulgated regulations governing the advertising and sale of cigarettes, smokeless tobacco, and cigars. 533 U.S. at 534–36, 121 S.Ct. 2404. The Attorney General argued that the cigarette advertising regulations were not "based on smoking and health" because they did not involve health-related content but instead targeted youth exposure to cigarette advertising. *Id.* at 547, 121 S.Ct. 2404. The Supreme Court rejected the Attorney General's narrow construction of the phrase, finding that the concern about youth exposure to cigarette advertising was intertwined with the concern about cigarette smoking and health. *Id.* at 548, 121 S.Ct. 2404. Unlike in this case involving a general state law against false representations, *Reilly* involved a state regulation expressly targeting the cigarette industry. Where the state law specifically targets cigarettes,

the predicate duty is more clearly intertwined with the health effects of smoking. This Court recognizes that it is a fine distinction, as pointed out by Justice Scalia's dissent in *Cipollone,* which criticized the plurality's frequent shift in the level of generality at which it examined individual claims. *Cipollone,* 505 U.S. at 543, 112 S.Ct. 2608. Nevertheless, this Court must follow the analysis of the plurality opinion in *Cipollone,* which did conclude that a general intentional fraud claim arises from the more general duty not to deceive.[5]

The Court likewise does not find the *Dahl v. R.J. Reynolds Tobacco Company* case convincing. *See* 2005 WL 1172019 (D.Minn. May 11, 2005) (unpublished opinion). First, as discussed *supra,* the Court finds that Plaintiffs have stated a false representation claim arising from a duty not to deceive separate and apart from a failure-to-warn or warning neutralization claim. In addition, the district court in *Dahl* placed too great an emphasis on whether the claim would compel the defendant to modify its advertising in some way. *See Dahl,* 2005 WL 1172019, *8. Unlike the district court in *Dahl,* the Supreme Court in *Cipollone* did not look at the results of what would occur if the defendant were found liable under plaintiff's fraud claim. In *Cipollone,* as in this case, if the defendant were found to have engaged in fraud, the defendant might feel compelled to change its labeling or advertisements to avoid future suits; however, the Court did not thereby conclude that the claim was necessarily preempted. The reason is that the *Cipollone* Court determined that the "with respect to advertising" phrase was a separate and distinct element from the

---

**5.** Justices Blackmun, Kennedy, and Souter, all of whom concurred in part and dissented in part, concluded that the FCLAA did not preempt any state common law claims. *Cipollone,* 505 U.S. at 534, 112 S.Ct. 2608. A majority of the Court thus agreed that the

FCLAA did not preempt the plaintiff's false representation of a material fact claim. Since *Cipollone,* courts have treated the plurality opinion as if it were the majority opinion. *Spain,* 363 F.3d at 1192 & n. 4, and cases cited therein.

"based on smoking and health" phrase. The *Cipollone* Court acknowledged that an intentional fraud claim arising from a state law with respect to advertising can still be exempt from preemption where the duty is not based on smoking and health. 505 U.S. at 528–29, 112 S.Ct. 2608. The *Cipollone* Court clearly held that claims based on false statements of material fact arise from a duty not to deceive and are not based on a duty "based on smoking and health." *Id.* For all the above reasons, the Court is also not persuaded by the additional cases on which Defendant relies in support of its argument that the claims are expressly preempted.

In sum, Plaintiffs' UPA claim alleges a fraudulent misrepresentation claim arising from a duty not to deceive, which is not expressly preempted by the FCLAA. To the extent Plaintiffs' UPA claim can be construed as a failure-to-warn, fraudulent concealment, or warning neutralization claim, those theories are expressly preempted by the FCLAA. Plaintiffs are thus limited to their claim that the use of the descriptive terms "lights" and "lowered tar and nicotine" on packaging and advertising for Marlboro Lights and Cambridge Lights cigarettes is deceptive, and that the Plaintiffs relied on these deceptive representations to their detriment. This Court must now examine whether the remaining UPA claim can survive summary judgment in light of the UPA exemption provision.

**B. UPA Exemption**

The UPA contains the following statutory exemption:

> Nothing in the Unfair Practices Act shall apply to actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States, but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act.

NMSA § 57–12–7. The core dispute between the parties is whether the FTC has "expressly permitted" the use of the terms "lights" and "lowered tar and nicotine" under laws administered by the FTC.

Philip Morris argues that the exemption applies in this case because the FTC has expressly permitted cigarette companies to use the terms "light" and "lowered tar and nicotine" when the terms are substantiated by FTC Method test results. Philip Morris asserts that the FTC has extensively regulated the marketing and packaging of "Lights" cigarettes in accordance with its authority under the FTC Act and the FCLAA. Philip Morris also contends that the FTC expressly permitted the use of "lights" and "lowered tar and nicotine" descriptors, as evidenced by its October 1967 policy statement; its confirmation of that policy in its 1968 Report to Congress; its 1971 final order and consent decree in *AMERICAN BRANDS;* its declining to take formal action against tobacco companies who advertise cigarettes as low tar, light, ultra low tar, or lower in tar with respect to the 1992 petition filed by the Coalition on Smoking OR Health; and its 1995 final order and consent decree in *AMERICAN TOBACCO.*

Plaintiffs counter that the FTC has never "expressly permitted" the use of the descriptors "lights" and "lowered tar and nicotine" because the FTC has not promulgated a formal regulation allowing the use of such descriptors. In support, Plaintiffs point to the FTC's 1997 request for comment, which asked whether there was a need for official guidance with respect to the terms used marketing lower-rated cigarettes; the deposition testimony of the FTC's corporate representative who stated that the FTC does not have a view on the use of descriptors; and Philip Morris' 2002

Petition for Rulemaking to the FTC in which it asked the FTC to promulgate regulations to ensure the uniform use of such descriptors. Plaintiffs contend that the FTC could not have "expressly permitted" the use of the terms without having promulgated a formal rule or regulation.

### 1. The UPA Exemption Provision

 In determining the meaning and scope of the UPA exemption provision, this Court will look first to the statute itself. The prevailing rule of statutory construction requires "that words of a statute should be given their ordinary, everyday meaning, and in the absence of a clear and express legislative intention to the contrary, the language of the statute is conclusive." *State ex rel. Reynolds v. Aamodt*, 111 N.M. 4, 5, 800 P.2d 1061, 1062 (1990). Courts may look to the dictionary to supply meanings to undefined terms. *See Carmichael v. The Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir.2003) (citing *FDIC v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)) (noting that ordinary or natural meaning may be supplied by dictionary); *Spingola v. Spingola*, 91 N.M. 737, 743, 580 P.2d 958, 964 (1978) (looking to dictionary to determine accepted meaning of term).

 The New Mexico legislature amended NMSA § 57–12–7, effective June 18, 1999, to its current form. Prior to the amendment, the exemption provision read: "Nothing in the Unfair Practices Act shall apply to actions or transactions permitted under laws administered by a regulatory body of the state of New Mexico or the United States." *See State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 807, 737 P.2d 1180, 1184 (Ct.App.1987) (quoting pre-amendment NMSA § 57–12–7). The current version of the statute contains the word "expressly" before "permitted under laws administered by a regulatory body of New Mexico or the United States" and concludes with the phrase "but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the [UPA]." NMSA § 57–12–7.

The Court finds that nothing in the language of the statute indicates that the exemption only applies if there is a statute or formal regulation expressly permitting the action. The legislature used the more expansive phrase "expressly permitted under laws administered by a regulatory body." Had the legislature wanted to limit the exemption to agency action in the form of a regulation, it could have done so explicitly by replacing the phrase "under laws administered by" with a phrase like "under statute or regulation adopted by" the agency. *See Price*, 302 Ill.Dec. 1, 848 N.E.2d at 38. The fact that the legislature did not use the term "regulation" suggests that the legislature intended a broader meaning of the phrase, so that the exemption would apply where an agency "expressly permitted" an action or transaction in ways other than through formal promulgation of a regulation. *See id.* at 38, 53 (concluding that legislature intended phrase "specifically authorized by laws administered by any regulatory body" in Illinois Consumer Fraud Act exemption provision to require deference to agency policy and practice and not to refer only to formal rulemaking). *See also* Black's Law Dictionary 884 (6th ed. 1990) ("Word 'law' generally contemplates both statutory and case law.").

The fact that the legislature amended the provision to add the term "expressly" to modify "permitted" does not change the Court's analysis. Black's Law Dictionary defines "express" as follows: "Clear; definite, explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly

and explicitly, and not left to inference. Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct." Black's Law Dictionary 580 (6th ed.1990). To permit is to "allow, consent, let; to give leave or license; ... or to expressly assent or agree to the doing of an act." *Id.* at 1140. Thus, the plain meaning of the phrase "expressly permitted" is that the agency make known its allowance of the action or transaction through clear, definite words. An agency can make its permission known through clear words in ways other than through a formal regulation, for example, by adjudicated cases and consent orders. *See N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (" '[A]djudicated cases may and do ... serve as vehicles for the formulation of agency policies, which are applied and announced therein,' and that such cases 'generally provide a guide to action that the agency may be expected to take in future cases.' ") (quoting *N.L.R.B. v. Wyman-Gordon Co.,* 394 U.S. 759, 765–66, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)).

This interpretation is supported by the fact that the legislature added the phrase "but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the [UPA]." This phrase suggests that an agency "expressly permits" an action or transaction when it has not forbidden the action and has not remained silent regarding the action or transaction. When an agency issues a consent order permitting an action, it has certainly not forbidden the action or remained silent.

In sum, the plain language of the statute indicates that the phrase "actions or transactions expressly permitted under laws administered by a regulatory body" is not limited to formal regulations promulgated by an agency. As discussed in the next section, the New Mexico cases construing the exemption provision support this interpretation.

### 2. New Mexico Case Law Interpreting the UPA Exemption Provision

■ The New Mexico Supreme Court has never ruled on whether § 57–12–7 exempts UPA false representation claims against cigarette manufacturers arising from their advertising and promotion of "lights" cigarettes. When a federal court is examining how to interpret a state law, it must look to the rulings of the highest state court, and if no such rulings exist, must try to predict how the high court would rule. *Johnson v. Riddle,* 305 F.3d 1107, 1118 (10th Cir.2002). In doing so, the federal court can consider all resources available, including decisions of New Mexico courts, other state and federal courts, and the general weight and trend of authority. *FDIC v. Schuchmann,* 235 F.3d 1217, 1225 (10th Cir.2000).

Only two New Mexico state cases analyzed the pre–1999 amendment exemption clause. *See Ashlock v. Sunwest Bank of Roswell, N.A.,* 107 N.M. 100, 753 P.2d 346 (1988), *overruled on other grounds by Gonzales v. Surgidev Corp.,* 120 N.M. 133, 899 P.2d 576 (1995); *State ex rel. Stratton v. Gurley Motor Co.,* 105 N.M. 803, 737 P.2d 1180 (Ct.App.1987). In *Ashlock,* the New Mexico Supreme Court ruled that § 57–12–7 did not exempt the plaintiff's UPA claim based on a bank's failure to pay plaintiff interest due on an account that the bank advertised as being a high interest-bearing account. 107 N.M. at 100–01, 103, 753 P.2d at 346–47, 349. The bank argued that it was exempt because a federal statute directed the Board of Governors of the Federal Reserve System to regulate banks to prevent unfair trade practices. *See id.* at 103, 753 P.2d at 349. The court rejected the argument, stating that its "attention has not been directed to any feder-

al statute or regulation that would evidence the intention of Congress or the federal regulatory branch to regulate, to any extent, the bank's failure to deliver goods or services as promised." *Id.* Although this statement suggests that the New Mexico Supreme Court seemingly requires at least some legislation or regulation directed at the same type of activity for which a plaintiff alleges a violation of the UPA in order for the exemption to apply, the court did not definitively rule on whether other forms of "permitting" the activity by a regulatory body were covered by the exemption, as the specific issue was not before the court. Therefore, this Court does not view the statement in *Ashlock* as informative of this issue.

In *Stratton*, the New Mexico Court of Appeals actually had occasion to address the meaning of "permitted under laws administered by a regulatory body." 105 N.M. at 807, 737 P.2d at 1184. The court analyzed whether the UPA exception exempted the activities of a car dealer who allegedly directed customers to an insurance provider without disclosing the substantial rebate the insurance provider gave to the car dealer when a customer purchased insurance. *Id.* at 805, 807, 737 P.2d at 1182, 1184. The defendant argued that it was subject to the Insurance Holding Company Act, and thus the exemption applied. *See id.* at 807, 737 P.2d at 1184. The court of appeals disagreed, noting that the rebates were not explicitly permitted under the Insurance Holding Company Act or even implicitly authorized. *See id.* The court of appeals stated that the exemption "require[s] more than the mere existence of a regulatory body" to apply. *Id.* The court of appeals further explained:

> At a minimum, the regulatory body must actually administer the regulatory laws with respect to the party claiming the exemption, thereby exercising at least the modicum of oversight that the exempting language indicates is re-

quired. In effect, this means the regulatory body must render permission to engage in the business of the transaction through licensing, registration or some similar manifestation of "permitting" the business activity.

*Id.* Because the defendant was not authorized to deal in insurance and its alleged activities were not authorized transactions permitted under the state insurance laws, the court held that the defendant's activities were not exempted from actions under the UPA. *Id.* at 808, 737 P.2d at 1185. Importantly, *Stratton's* statement that a regulatory body must render permission through "licensing, registration *or some similar manifestation of 'permitting' the business activity*" indicates a more expansive view of what constitutes "permitting under laws" and suggests that the exemption provision does not require a formal regulation or rule in order to apply. *See id.* at 807, 737 P.2d at 1184.

Federal courts in this district also addressed the pre-amendment exemption provision. Philip Morris relies heavily on the Honorable James A. Parker's decision of *Campos v. Brooksbank*, 120 F.Supp.2d 1271 (D.N.M.2000), in support of its test governing the application of the exemption. In *Campos*, Judge Parker examined whether the exemption applied to claims against an attorney who allegedly committed misrepresentations in the course of trying to collect a debt. *Id.* at 1272, 1275. The attorney claimed that he was exempt under the UPA because he was subject to the exclusive disciplinary jurisdiction of the New Mexico Supreme Court and the Disciplinary Board. *Id.* at 1275. Judge Parker interpreted the *Stratton* and *Ashlock* opinions as creating a two-part test for determining whether the § 57–12–7 exemption applies. *Id.* at 1276. He concluded that the exemption applies if (1) the defendant's activities generally are subject to regulation by an appropriate state or

federal agency, and (2) the specific activity that would otherwise constitute a violation of the UPA is in fact permitted by the applicable law or regulation. *Id.* In applying the test to the facts of the case, the court concluded that it was undisputed that the first element was met because the defendant's activities as a lawyer were state-regulated. *Id.* at 1277. As to the second element, the court determined that the specific activity that constituted a violation of the UPA was the filing of a false or deceptive affidavit and seeking a deposition in order to intimidate, which were not permitted by state law. *Id.* The court explained that the phrase "actions or transactions permitted" must be given a narrow reading in that the manner in which the activity was done must itself be permitted in order for the exemption to apply. *See id.* at 1277–78. The *Campos* court, however, did not have occasion to address what forms of regulatory activity can "permit" the action or transaction within the meaning of the exemption provision.

Two New Mexico cases have analyzed the exemption provision after the enactment of the 1999 amendment. In *Valdez v. State*, 2002–NMSC–028, 132 N.M. 667, 54 P.3d 71, the New Mexico Supreme Court examined whether the UPA exemption provision applied to the plaintiffs' UPA claim that was based on allegedly illegal agreements between telephone service companies and various state governmental entities that allowed companies to charge a higher rate for collect telephone calls from incarceration facilities than they charged the general public. The defendants argued that the UPA claim was exempt because the New Mexico Public Regulation Commission ("NMPRC") was authorized to fix, determine, and regulate telephone rates within the state according to statute. *Id.* ¶ 8, 132 N.M. at 672, 54 P.3d at 76. The New Mexico Supreme Court agreed, reasoning that, because the

rates at issue were under the primary jurisdiction of the NMPRC, a regulatory agency, and the NMPRC authorized the rates when they were filed, the rates were expressly permitted. *Id.* ¶¶ 5, 8, 132 N.M. at 671–72, 54 P.3d at 75–76. What is significant about the *Valdez* opinion is that it does not appear that the NMPRC approved the specific rate at issue through a formal regulation. *See id.* Although the court cited to the general statute that authorized the NMPRC to fix rates, that statute merely showed that the first requirement of the two-part test was met—that the defendant's activities generally were subject to regulation by the appropriate state agency. That general statute did not approve the specific activity alleged to be unlawful—the higher rates charged to collect calls for incarcerated persons, which the NMPRC apparently authorized when the rate was actually filed. It therefore appears that the New Mexico Supreme Court recognizes that the phrase "expressly permitted under laws administered by a regulatory body" does not mean that a formal regulation must be the means by which the agency permits the specific activity.

The most recent appellate case addressing the UPA exemption provision is *Azar v. Prudential Ins. Co. of America*, 2003–NMCA–062, 133 N.M. 669, 68 P.3d 909 (2003). *Azar* also suggests that a specific statute or regulation may not be required in order to show "express" authorization. In *Azar*, plaintiff policyholders brought suit under the UPA based on allegations that their insurers failed to adequately disclose to them the additional costs of paying their premiums in installments, called "modal" or "fractional" premiums, instead of once annually. *Id.* ¶ 1, 133 N.M. at 675, 68 P.3d at 915. The defendant argued that it was exempt from the plaintiffs' UPA claim because (1) the Federal Reserve Board pursuant to the Truth in

Lending Act ("TILA"), 15 U.S.C. §§ 1601–1693, determined that consumers were not misled when paying modal premium charges without first receiving information about finance charges and APR rates; and (2) the New Mexico Insurance Division expressly permitted the sale of the defendant's policies by approving the policies without requiring additional finance charge or APR disclosures. *Id.* ¶ 66, 133 N.M. at 689, 68 P.3d at 929.

The court of appeals rejected the first argument because TILA did not apply to non-credit transactions, and thus the "Federal Reserve Board's regulations and interpretations" did not control the installment insurance premium plan at issue. *Id.* ¶ 67, 133 N.M. at 689, 68 P.3d at 929. The court also rejected the defendant's second argument. *Id.* ¶ 68, 133 N.M. at 689, 68 P.3d at 929. The court acknowledged that the Insurance Division did administer the regulatory laws governing the issuance of insurance policies in New Mexico, *see id.,* indicating that the first requirement of the *Campos* test was satisfied. The court nevertheless concluded that the second requirement was not met, because the challenged activity—the defendant's non-disclosure of certain information regarding modal premium practices—was not "expressly permitted" by the Insurance Division. *See id.* (citing the *Campos* opinion with approval). In holding that § 57–12–7 did not exempt the UPA claim, the New Mexico Court of Appeals explained that "the Insurance Division has never specifically addressed the subject of modal premiums, *and* both the Insurance Code and the regulations are silent on the subject." *Id.* (emphasis added). Inclusion of the word "and" indicates that an agency can specifically address and authorize an action on a particular subject in ways other than through promulgation of a regulation. *See id.* This reading of the statute is further supported by the statement in *Azar* that "the Federal Re-

serve Board's regulations *and interpretations* do not control installment insurance premium plans like the ones in this case." *Id.* (emphasis added). The use of the term "interpretations" indicates that formal regulations are not the only means of "expressly permitting" an action or transaction under the statute and that an agency's interpretations expressly set forth in a consent order can serve to "expressly permit" the action or transaction. Therefore, the *Azar* opinion, like the *Valdez* opinion, suggests that the absence of a formal regulation is not dispositive of whether an agency "expressly permitted" an action or transaction, so long as the agency "specifically addressed the subject" in some other way. *See id.*

Based on the language of § 57–12–7 and the New Mexico cases interpreting the statutory exemption, the Court concludes that an agency can administer laws expressly permitting an action or transaction through ways other than formal regulation. Using this construction of the UPA exemption clause, the Court must now determine whether the exemption applies in this case.

### 3. Whether the FTC "Expressly Permitted" Use of Terms "Lights" and "Lowered Tar and Nicotine" within meaning of UPA Exemption

 In order to determine whether the FTC's actions in overseeing and regulating cigarette advertising compel the application of the UPA exemption in this case, this Court must determine (1) if Philip Morris' activities generally are subject to regulation by the FTC, and (2) whether the specific activity which would otherwise constitute a violation of the UPA, here, the use of the terms "lights" and "lowered tar and nicotine" in cigarette advertising, is in fact "expressly permitted under laws ad-

ministered by" the FTC. *See Azar*, 2003–NMCA–062, ¶ 68, 133 N.M. at 689, 68 P.3d at 929; *Stratton*, 105 N.M. at 807, 737 P.2d at 1184; *Campos*, 120 F.Supp.2d at 1276.

There does not appear to be a dispute as to the first element. Cigarette advertising and promotion are clearly subject to regulation by the FTC. The FTC Act empowers the FTC to prevent persons, partnerships, and corporations from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2). Congress clearly contemplated continued FTC regulation in cigarette advertising when enacting the FCLAA: "Nothing in this chapter ... shall be construed to limit, restrict, expand, or otherwise affect the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practices in the advertising of cigarettes." 15 U.S.C. § 1336. *See also Reilly*, 533 U.S. at 548, 121 S.Ct. 2404 ("[T]o the extent that Congress contemplated additional targeted regulation of cigarette advertising, it vested that authority in the FTC."); *Watson*, 420 F.3d at 861 (FTC has shown "comprehensive and detailed control" over cigarette industry advertising). The Court therefore finds the first element is met in this case. More problematic, however, is the second element.

Over the years, the FTC has used a number of different means through which to regulate advertising in the cigarette industry: formal agency rulemaking, the issuance of advisory opinions, the use of voluntary agreements, and the initiation of enforcement proceedings against individual manufacturers that result in the entry of a consent order. *See supra* Section II.A. The record shows that the FTC has extensively regulated and overseen cigarette advertising for decades, including the industry's use of terms such as "lights" and "lowered tar and nicotine."

In September 1955, the FTC adopted the Cigarette Advertising Guides, which allowed cigarette manufacturers to make claims regarding tar and nicotine levels, but only if they could substantiate their claims "by competent scientific proof." Miller Aff. ¶ 73 & Def.'s Ex. 68, 70; *Price*, 302 Ill.Dec. 1, 848 N.E.2d at 7. In 1959, the FTC issued an advisory stating that all representations of low or reduced tar or nicotine would be construed as health claims. The FTC indicated its intent to take enforcement action against cigarette manufacturers making such representations, which effectively banned the advertising. Miller Aff. ¶ 78; Def.'s Ex. 79; *Price*, 302 Ill.Dec. 1, 848 N.E.2d at 7.

In 1966, the FTC reversed course when scientific evidence suggested that cigarettes with lower levels of tar and nicotine might be less harmful to health than cigarettes with higher tar and nicotine levels. Miller Aff. ¶ 94 & Def.'s Ex. 78, 105, and 106. On October 26, 1967, the FTC publicly announced a clarification of their enforcement policy in regard to representations relating to tar and nicotine content of cigarettes. Miller Aff. ¶ 169 & Def.'s Ex. 124 & 207. The FTC stated that it would not challenge representations "where they are shown to be accurate and fully substantiated by tests conducted in accordance with" the FTC Method. Def.'s Ex. 124 at 3. The FTC further clarified that a cigarette testing relatively high or not among the lowest in tar and nicotine yield should not be represented to be otherwise and that a cigarette testing relatively low in comparison with other brands may be so represented, provided that the basis for comparison is fully and fairly stated. *Id.* In its 1968 Report to Congress, the FTC stated that it had issued a policy statement on October 26, 1967, which indicated that as "a general rule" the FTC would not challenge statements or representations of or relating to tar and nicotine content of cigarettes where they were shown to be accurately and fully substantiated by tests

conducted in accordance with the FTC Method. Miller Aff. ¶ 170 & Def.'s Ex. 98 at 18. The FTC wanted consumers to be able to make comparisons between brands and advocated disclosure of tar and nicotine content, even though the FTC was aware that its testing method did not replicate actual smoking behavior and that smokers tended to compensate.

Furthermore, in 1969, the FTC clarified through an advisory opinion that advertisers could "almost always" avoid imprecision in use of words such as "low," "lower," "reduced," and similar words by clearly and conspicuously disclosing the tar and nicotine content of the advertised cigarette, the brand to which it was being compared, and the domestic cigarettes with the highest and lowest yields. *See AMERICAN BRANDS, INC.*, 1970 WL 117288, 77 F.T.C. 1623 (1970). In an FTC Order, the FTC subsequently indicated that this advisory opinion constituted an explicit expression of the standards of fair dealing. *See id.*

In 1971, the FTC enforced its aforementioned policies when it entered into a consent order with American Brands, Inc. The consent order prohibited use of "low," "lower," or "like qualifying terms" [6] unless the statements were accompanied by a clear and conspicuous disclosure of the tar and nicotine content in milligrams produced by the advertised cigarette. 79 F.T.C. 255. The order thus allowed American Brands, Inc., to use the word "low," "lower," or other like terms when it disclosed the tar and nicotine content of the advertised cigarette. This was the FTC policy and law in effect at the time Marlboro Lights cigarettes entered the market in 1971 and when Cambridge Lights cigarettes entered the market in 1986.

In 1995, the FTC again reiterated its authorization of the use of the terms "low," "lower," or "lowest" when it issued its consent order *IN THE MATTER OF THE AMERICAN TOBACCO CO.*, 119 F.T.C. 3, 3–4 (1995). The FTC asserted that the advertisements were misleading because they indicated that consumers will get less tar by smoking 10 packs of Carlton cigarettes than by smoking a single pack of the other brands depicted when, in truth, the ratings were based on smoking machine tests that did not reflect actual smoking or take into account compensatory smoking behavior. *Id.* at 4. The consent agreement prohibited American Tobacco Company from representing, through tar ratings of its brands of cigarettes as a numerical multiple, fraction, or ratio of the tar of any other brand of cigarettes, or through visual depictions of ten packs of any of its brands versus one pack of any other brand, that consumers would get less tar by smoking ten packs of any cigarette rated as having 1 mg. of tar than by smoking a single pack of any other brand of cigarettes rated as having more than 10 mg. of tar. *Id.* at 9–10. The order clarified, however, that it would not be a violation for American Tobacco Company to present in its advertisements tar and nicotine ratings of its brand and any other brand with an express or implied representation that its brand was "low," "lower," or "lowest" in tar and/or nicotine so long as no more than a single cigarette or pack of its brand was visually depicted versus a single cigarette or pack of any other brand. *Id.* at 11.

Although the 1971 and 1995 consent orders were specific to American Brands, Inc., and American Tobacco Company, respectively, their legal effect had broad-

---

**6.** The Court finds that, based on the record, "lights" constitutes a "like qualifying term" of "low" or "lower" in tar and nicotine.

er implications for all cigarette manufacturers. A consent order directed to one cigarette manufacturer legally serves to regulate behavior of other cigarette manufacturers, as it states what the FTC considers a violation of the law against unfair and deceptive practices. *Cf. Bell Aerospace Co.,* 416 U.S. at 294, 94 S.Ct. 1757 (" '[A]djudicated cases may and do . . . serve as vehicles for the formulation of agency policies, which are applied and announced therein.' ") (quoting *Wyman–Gordon Co.,* 394 U.S. at 765, 89 S.Ct. 1426); *Watson,* 420 F.3d at 859–60 (FTC uses enforcement actions for deceptive advertising against individual companies in order to compel tobacco industry to follow its policies). As the Eighth Circuit explained, "Bringing a single case against one cigarette company would have the effect of bringing the whole industry into compliance and would do so much more quickly than would a formal rulemaking process." *Watson,* 420 F.3d at 859. The FTC's enforcement mechanism through consent orders is no less effective and coercive than direct enforcement through a formal regulation. *See Watson,* 420 F.3d at 859–60. *See also Cipollone,* 505 U.S. at 513 & n. 7, 112 S.Ct. 2608 (stating that FTC has "long regulated unfair and deceptive advertising practices in the cigarette industry," and citing a number of FTC opinions in support of this proposition, implicitly recognizing that FTC opinions and orders are form of FTC regulation). The legal and regulatory effect of the consent orders is evidenced by the FTC's own description of its consent orders as "[r]egulatory activity." Miller Aff. ¶ 187 & Def.'s Ex. 139 at 13–14; *Price,* 302 Ill. Dec. 1, 848 N.E.2d at 13. The history of FTC involvement in cigarette advertising demonstrates that the FTC used consent orders such as these to regulate the cigarette industry, make general rules, and express FTC policies for the industry in lieu of formal rulemaking.

In its 1971 and 1995 consent orders, the FTC made known in clear, specific, definite words that it permitted the use of the terms "lowered tar and nicotine" and other like terms, such as "lights," in cigarette advertising so long as FTC Method ratings were included in the advertising. The consent orders "specifically addressed the subject of" the use of the terms "lowered tar and nicotine" and the like term "lights" and expressly stated the FTC's legal conclusion that the use of the terms, when accompanied by FTC Method testing results, was permissible under and did not violate 15 U.S.C. § 45, the law the FTC has authority to administer. *See Watson,* 420 F.3d at 862 (stating that plaintiffs' claim that it is deceptive for Philip Morris to use low tar descriptor in conjunction with its cigarettes' FTC rating is the very combination that the FTC requires to not be deceptive under 1971 consent order). The FTC has in no way remained silent on this issue. Based on the language of § 57–12–7, the New Mexico cases construing the exemption provision, and the evidence in the record, this Court concludes that the FTC's regulatory activity, including the 1971 and 1995 consent orders, fall within the scope of the UPA requirement that the action be "expressly permitted under laws administered by" the FTC. *See Azar,* 2003–NMCA–062, ¶ 68, 133 N.M. at 689, 68 P.3d at 929 (suggesting that agency can "expressly permit" action in interpretations where it "specifically addressed" and authorized action). *Cf. Price,* 302 Ill. Dec. 1, 848 N.E.2d at 46, 53–54 (holding that FTC's informal regulatory activity of cigarette advertising, including use of consent orders, fell within Illinois Consumer Fraud Act's exemption provision exempting actions or transactions "specifically au-

thorized by laws administered by" a state or federal regulatory body).[7]

The Court is not persuaded that the FTC's 1997 request for comment on whether there was a need for official guidance with respect to the terms used in marketing lower-rated cigarettes shows that the FTC had not previously permitted the use of the terms in its consent orders. The FTC was merely soliciting comments on both sides of the issue in order to determine future policy. This request does not negate the fact that the FTC had previously expressed its permission in the consent orders for the industry to use the terms "lights" or "lowered tar and nicotine" when accompanied by FTC Method ratings. The fact that the FTC's corporate representative stated that the FTC does not have a view on the use of descriptors also does not change this Court's determination that the FTC did, in fact, express its permission in the consent orders for cigarette manufacturers to use descriptors in advertising, so long as the descriptors were accompanied by FTC Method results. Finally, the Court finds irrelevant the fact that Philip Morris petitioned the FTC in 2002 to promulgate regulations to ensure that descriptors are used in a uniform manner throughout the industry. Given the litigation Philip Morris faces

throughout the nation on this issue, and the varying court decisions on whether the FTC had indeed permitted the use of the descriptors, it is not surprising that Philip Morris wanted the FTC to use formal rulemaking instead of its other forms of regulatory activity. The petition only confirms what is undisputed—that the FTC to date has not expressed its permission of the use of the descriptors *by formal rulemaking*. The petition, however, does not diminish the force and effect of the FTC's other regulatory actions, including the issuance of consent orders.

For all the foregoing reasons, the Court determines that the UPA exemption in § 57–12–7 applies to and requires dismissal of Plaintiffs' UPA claim based on Marlboro Lights and Cambridge Lights advertisements that contain the words "lights" and/or "lowered tar and nicotine" accompanied by the tar and nicotine content in milligrams of the cigarettes according to FTC Method testing. It is undisputed, however, that Marlboro Lights cigarette packages have never contained numerical information concerning tar and nicotine yields. Pls.' Ex. 5 at 7. The Court therefore cannot find based on the record currently before it that the 1971 and 1995 consent orders expressly permit use of the term "Lights" on cigarette packages when

**7.** Philip Morris relies heavily on the *Price* opinion in support of this conclusion. The Court notes that, in holding that the 1971 and 1995 FTC consent orders "expressly permit" the use of the terms "lights" and "lowered tar and nicotine" in cigarette advertising when accompanied by FTC Method ratings, it finds much of the reasoning of the *Price* opinion persuasive, particularly its analysis of why the exemption provision does not require formal rulemaking or official definitions. The Illinois Supreme Court in *Price*, however, stated that a consent order is express only to the party to the order and is an implied rule to other industry members. *See Price*, 302 Ill. Dec. 1, 848 N.E.2d at 45, 53–54. This Court departs from the *Price* court's reasoning to the extent it concludes that a rule announced

in a consent order cannot constitute "express permission" to other industry members. Although a consent order is directed to the parties to the order, clear rules can be announced in consent orders that have general application to the industry. *See Bell Aerospace*, 416 U.S. at 294, 94 S.Ct. 1757. This Court concludes that, when the FTC announces a substantive rule permitting a certain action in an adjudication that has general application to the industry, the FTC has "expressly permitted" the action as to all industry members similarly situated within the meaning of the UPA. As just discussed, the Court finds that the 1971 and 1995 consent orders constitute such adjudications with general application to the cigarette industry.

there is no disclosure of the FTC Method ratings of the cigarettes.[8]

■ Philip Morris nevertheless argues that the FTC expressly permitted the use of the term "lights" in its Marlboro Lights packages in its October 1967 policy statement in which the FTC stated it would not challenge representations relating to tar and nicotine content so long as they were accurate and substantiated by the FTC Method. The problem with this argument, however, is that the 1971 consent order modified, or at least clarified, the October 1967 policy by stating that representations of "low" tar and nicotine, and other like terms, were permissible only when accompanied by disclosure of FTC Method tar and nicotine levels. At the time Marlboro Lights cigarettes entered the market, the FTC's most recent and specific policy expression was set forth in the 1971 American Brands consent order. Because an agency is free to change or modify its policies over time, this Court must therefore look to the language of the 1971 consent order to determine what the FTC expressly authorized in cigarette advertising at the time Marlboro Lights cigarettes entered the market.

The record also does not indicate that, after 1971, the FTC "expressly permitted" the use of the term "lights" on cigarette packages without the inclusion of FTC Method ratings. Philip Morris' reference to the 1992 petition filed by the Coalition on Smoking OR Health does not support its argument. Although the FTC investi-

gated the petition, it took no formal action against the cigarette companies and did not change its policy on the use of the term "lights." *See* Miller Aff. ¶ 146, 198 & Def.'s Ex. 181 at 484–95, Def.'s Ex. 37 at 55, 68. As § 57–12–7 makes clear, silence on the issue does not constitute express permission. Therefore, for the foregoing reasons, Plaintiffs' UPA claim arising from the duty to deceive is not exempted to the extent it relies on the use of the term "lights" or "lowered tar and nicotine" on Marlboro Lights or Cambridge Lights cigarette packages without disclosing the tar and nicotine content in milligrams of the cigarettes according to FTC Method testing or to the extent it relies on any other advertising of Marlboro Lights or Cambridge Lights cigarettes that contain the terms "lights" and/or "lowered tar and nicotine" without disclosing the tar and nicotine content in milligrams of the cigarettes according to FTC Method testing. *See Aspinall,* 2006 WL 2971490 at \*8 (concluding that plaintiffs' claims arising from deceptive use of terms "lights" and "lowered tar and nicotine" in cigarette advertisements were not subject to Massachusetts exemption provision because defendant's actions were not "otherwise permitted" by FTC where defendant admittedly never included FTC Method milligram yields of tar and nicotine on Marlboro Lights cigarette packages).

## C. Implied Preemption

■ Finally, Defendant asserts that Plaintiffs' UPA claim is preempted by fed-

---

**8.** The FCLAA states, "No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package." 15 U.S.C. § 1334(a). That this provision may forbid the disclosure of FTC Method tar and nicotine levels on cigarette packages does not thereby mean that the FTC "expressly permits" the use of the term "lights" without FTC Method ratings on cigarette packages. An alternative view is that the term "lights"

should not be used at all on packages since FTC Method ratings could not accompany such statements. In fact, since as early as 1967, the FTC expressed its position that the FCLAA should be amended to require the tar and nicotine content of each cigarette to appear on all cigarette packages as well as in all cigarette advertising. *See* Miller Aff. ¶ 109 & Def.'s Ex. 99 at 30. It is thus unclear what the FTC's policy is on the use of "lights" and similar descriptors on cigarette packages.

eral law under principles of implied conflict preemption. In *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), the Supreme Court summarized the principles of implied conflict preemption:

> We have recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law. We have found implied conflict pre-emption where it is "impossible for a private party to comply with both state and federal requirements," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* at 287, 115 S.Ct. 1483 (citations omitted).

Defendant contends that Plaintiffs' claim is preempted because it impermissibly conflicts with, and stands as an obstacle to, the FTC's regulatory activities and judgment under the FTC Act regarding the marketing of low-tar and light cigarettes. According to Defendant, Plaintiffs are attempting to hold Defendant liable under state law "for using exactly the type of descriptive terms that the FTC authorized cigarette companies to use in the exact manner that the FTC required to ensure such terms were *not* unfair or deceptive."

If Plaintiffs were seeking to hold Defendant liable under the UPA for using descriptive terms in a manner that the FTC had found was not unfair or deceptive, it would clearly interfere with the FTC's authority to regulate deceptive and unfair advertising. Plaintiffs' sole surviving claim, however, is that Defendant was not using the terms "lights" and "lowered tar and nicotine" in the manner approved by the FTC because Defendant was not disclosing tar and nicotine information on cigarette packages. The Court must therefore determine if a state finding that the use of the terms "light" or "lowered tar and nicotine" without disclosing the nicotine and tar content of the cigarettes is deceptive would make it "impossible for a private party to comply with both state and federal requirements," or would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

As discussed above, there is no FTC requirement that Defendant use the terms "light" or "lowered tar and nicotine." At most, the FTC found the use of such descriptors permissible if they were accompanied by disclosure of Cambridge Filter Method tar and nicotine levels. Consequently, a finding that such terms are deceptive under the UPA when used without accompanying tar and nicotine information would not make it "impossible for a private party to comply with both state and federal requirements."

Defendant also argues that Congress has the exclusive authority to set the content of the warning label on cigarette packages and has never required numerical disclosures of tar and nicotine on cigarette packages. And, therefore, according to Defendant, the FTC could not, and has not, required numerical disclosures of tar and nicotine on cigarette packages. It does not appear, however, that anything prohibited Defendant from voluntarily disclosing tar and nicotine information on cigarette packages if it wanted to use the descriptor "lights" on the cigarette packages. Or, in the alternative, assuming that the voluntary numerical disclosure of tar and nicotine information on cigarette packages would violate the FCLAA, Defendant could have avoided any conflict by not using descriptors on its cigarette packages. Consequently, on the record before it, the Court cannot say that a finding that the use of the descriptor "lights" on cigarette

packages without accompanying nicotine and tar information is deceptive under the UPA would make it impossible for Defendant to comply with both state and federal requirements.

Whether a finding that the use of descriptors without accompanying nicotine and tar information would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," is a more difficult question. FTC allowed the use of descriptors to encourage the dissemination of truthful tar and nicotine yields. Use of the descriptors alone, however, does not fulfill this purpose. Consequently, a finding that use of descriptors without disclosure of FTC Method tar and nicotine levels is deceptive would not frustrate FTC's objective of encouraging the dissemination of truthful tar and nicotine yields.

Plaintiffs' claim does not appear to pose any conflict with FTC's policies of permitting the use of descriptors in advertising when nicotine and tar yields are disclosed and of encouraging "truthful advertising that ensures that consumers are informed in their decision whether or not to smoke."

FTC also has, as an objective, uniform national standards for advertising of cigarettes. Defendant argues that the FTC has expressly stated that lawsuits such as this one would interfere with the FTC's uniform national policies. In support of this argument, Defendant asserts that the FTC, through then FTC Chairman Daniel Oliver, has opined that imposing liability for communicating tar and nicotine yields would create the "very real possibilit[y]" of "an irreconcilable conflict" with uniform national policy. In response to a request for comment on the question of whether Congress should permit state and local governments to regulate cigarette advertising, Oliver expressed concern that state warnings might be inconsistent or undermine the warnings mandated by the FCLAA; that inconsistent state warnings might function as an effective ban on advertising; and that inconsistent state advertising restrictions could result in irreconcilable conflicts for advertisers.

A finding that the use of descriptors on cigarette packages *without* disclosing tar and nicotine yields on cigarette packages is deceptive under New Mexico law is not analogous to permitting states to regulate cigarette advertising with the attendant risks that states will impose inconsistent and irreconcilable restrictions on advertising. At most, a finding that the use of descriptors without disclosing tar and nicotine content is deceptive under New Mexico law would require Defendant to remove descriptors from its cigarette packages. The removal of descriptors from cigarette packages, even if done nationwide, would not conflict with FTC's regulatory policies and goals because the FTC does not require the use of descriptors and only permits the use of descriptors in conjunction with the disclosure of tar and nicotine information.

The fact that the FTC, at the request of Defendant, is currently considering the use of product descriptors in connection with its ongoing federal notice and comment proceedings does not suggest that Plaintiffs' claims are impliedly preempted. Defendant's request that FTC consider the use of product descriptors does not negate the fact that the FTC has previously expressed its permission in the consent orders for the industry to use the terms "lights" or "lowered tar and nicotine" only when accompanied by FTC Method ratings. Actions the FTC may take as a result of the notice and comment proceedings may have implications for future preemption claims but Plaintiffs' claims must be analyzed under the current regulatory regime.

Plaintiffs' UPA claim asserting that Defendant used the term "lights" or "lowered tar and nicotine" on Marlboro Lights or Cambridge Lights cigarette packages without disclosing the tar and nicotine content of the cigarettes according to FTC Method testing on the cigarette packages violates the UPA is not barred by implied conflict preemption principles because the evidence before the Court is that it would not be "impossible for a private party to comply with both state and federal requirements" and a finding that the use of descriptors on the cigarette packages without supporting numerical tar and nicotine disclosures on the packages is deceptive would not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Philip Morris's Motion for Summary Judgment based on Federal Preemption under FCLAA's Express Preemption Provision, 15 U.S.C. § 1334(b), filed May 5, 2006, **[Doc. No. 54]** is **GRANTED** as to Plaintiffs' claims based on fraudulent concealment, failure to warn, and warning neutralization and **DENIED** as to Plaintiffs' claim based on a theory of fraudulent misrepresentation.

**IT IS FURTHER ORDERED** that Defendant Philip Morris's Motion for Summary Judgment Based on N.M. Stat. Ann. § 57–12–7 and Implied Federal Preemption, filed May 5, 2006, **[Doc. No. 53]** is **DENIED**.